IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

UNITED STATES OF AMERICA

v.                                          CAUSE NO. 1:22-cr-58-LG-RHWR-1

PATRICK DARNELL DANIELS, JR.

MEMORANDUM OPINION AND ORDER
DENYING DEFENDANT'S MOTION TO DISMISS

**BEFORE THE COURT** is the [24] Motion to Dismiss filed by Defendant,

Patrick Darnell Daniels, Jr.  The Government filed a [27] Response, to which

Defendant [28] replied.  This Defendant is under indictment for knowingly

possessing a firearm while an unlawful user of a controlled substance, in violation

of 18 U.S.C. § 922(g)(3).  Defendant has filed the instant [24] Motion to Dismiss the

indictment, arguing that 18 U.S.C. § 922(g)(3), is unconstitutional under the Second

Amendment and pursuant to the Supreme Court's recent decision in *New York*

*State Rifle & Pistol Assoc., Inc. v. Bruen*, --- S.Ct. ---, 2022 WL 2251305 (June 23,

2022). The Court has conducted a hearing on the matter and after due consideration

of the arguments of counsel, the record, and the applicable law, finds that the

Motion should be denied.

DISCUSSION

I.     **Second Amendment Framework**

Defendant argues that this case must be dismissed because section 922(g)(3)

is unconstitutional under the Second Amendment to the United States Constitution.

Therefore, to rule of this Motion, the Court must analyze and apply Second Amendment jurisprudence as articulated by the Supreme Court.

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court concluded, after thorough textual and historical analysis, that the Second Amendment confers "an individual right to keep and bear arms." *Id.* at 595. The Court was quick to note that "[l]ike most rights, the right secured by the Second Amendment is not unlimited." *Id.* at 626. Relevant here, the Court stated that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill." *Id.* In a footnote, the Supreme Court classified these traditional restrictions on firearm possession as a non-exhaustive list of "presumptively lawful regulatory measures." *Id.* at 627 n. 26. The Supreme Court went on to strike down a law in the District of Columbia which "totally bans handgun possession in the home." *Id.* at 628. In doing so, the Supreme Court conducted a historical analysis of handgun restrictions in the United States and found the D.C. restriction to be novel in its severity, targeting "the quintessential self-defense weapon." *Id.* at 629.

In *New York State Rifle & Pistol Assoc., Inc. v. Bruen*, --- S.Ct. ---, 2022 WL 2251305 (June 23, 2022), the Supreme Court again considered the contours of the Second Amendment right to bear arms. The Court characterized its earlier decisions as "recogniz[ing] . . . the right of an ordinary, law-abiding citizen to

possess a handgun in the home for self-defense." *Id.* at 5.  The Court was called upon to assess the constitutionality of a New York licensing scheme which allowed authorities to deny concealed-carry permits even where an applicant met certain threshold criteria.  *Id.* at 5-6.  In doing so, the Court clarified and explained the methodology to be used in addressing Second Amendment claims.  The Court rejected "a 'two-step' framework" involving "means-end scrutiny" in use by various appellate courts and instead clarified that the appropriate methodology centers "on constitutional text and history."  *Id.* at 7-10.  Hence, to answer Second Amendment questions, courts must "assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding."  *Id.* at 12.  In other words:

> In keeping with *Heller*, we hold that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct.  To justify its regulation, the government may not simply posit that the regulation promotes an important interest.  Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation.  Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

*Id.* (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50, n. 10 (1961)).

On the second prong of the *Bruen* test, the Court said: "'historical analysis can be difficult; it sometimes requires resolving threshold questions, and making nuanced judgments about which evidence to consult and how to interpret it.'"  *Id.* at 11 (quoting *McDonald v. City of Chicago*, 561 U.S. 742, 803-04 (2010) (Scalia, J., concurring)).  This analysis will often require the use of "historical analogies," whether because of "unprecedented societal concerns or dramatic technological

3

changes." *Bruen*, 2022 WL 2251305, at 12. Thus, "[w]hen confronting such present-day firearm regulations, this historical inquiry that courts must conduct will often involve reasoning by analogy." *Id.* at 13. "[E]ven if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id.*[1]

## II.    Application to Section 922(g)(3)

The Court now applies the Second Amendment framework outlined in *Bruen* to the criminal statute at issue. Section 922(g)(3) provides that "[i]t shall be unlawful for any person . . . (3) who is an unlawful user of or addicted to any controlled substance . . . [to] possess in or affecting commerce, any firearm or ammunition." 18 U.S.C. § 922(g)(3).

### 1.    Textual Analysis

The Court begins with the textual coverage of the Second Amendment. On this subject the Supreme Court has read "the Amendment's operative clause," that "'the right of the people to keep and bear Arms shall not be infringed,'" to mean that "'guarantees the individual right to possess and carry weapons in case of confrontation' that does not depend on service in the militia." *Bruen*, 2022 WL

---

[1] The opinion gives an example of analogical reasoning in the case of location-based firearm restrictions. Because there are historical analogues to modern "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings," *Heller*, 554 U.S. at 626, even though such analogues may have protected relatively few "sensitive places," still, "courts can use analogies to those historical regulations of 'sensitive places' to determine that modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places are constitutionally permissible." *Bruen*, 2022 WL 2251305, at 14.

2251305, at 9 (quoting *Heller*, 554 U.S. at 592).  Because section 922(g)(3) restricts the "possess[ion]" of "any firearm or ammunition," the Court concludes that section 922(g)(3) regulates conduct which is facially covered by the plain text of the Second Amendment.  *See* 18 U.S.C. § 922(g)(3).

The Court notes for the purpose of comprehensiveness that *Bruen* describes "ordinary, law-abiding, adult citizens" as indisputably "part of 'the people' whom the Second Amendment protects."  *Id.* at 14; *see also id.* at 12 ("The Second Amendment . . . 'surely elevates above all other interests the right of law-abiding, responsible citizens to use arms' for self-defense.") (quoting *Heller*, 554 U.S. at 635).  In fact, the Court specifically limited its decision to "may-issue" licensing regimes; it did not "suggest the unconstitutionality" of the "shall-issue" licensing regimes in use by 43 states, which "are designed to ensure only that those bearing arms in the jurisdiction are, in fact 'law-abiding, responsible citizens.'"  *Bruen*, 2022 WL 2251305, at 18 n. 9.  Because it is concerned with "unlawful" drug users and addicts, there is some doubt that section 922(g)(3) is textually covered by the Second Amendment, insofar as it has been interpreted to guarantee the right to keep and bear arms to ordinary, law-abiding, responsible citizens concerned with self-defense.  *See Roberge v. United States*, No. 1:04CR70, 1:10CV273, 2013 WL 4052926, at *17 (E.D. Tenn. Aug. 12, 2013) ("Persons like Roberge, who unlawfully use controlled substances, are not law abiding, responsible citizens.  Roberge can be lawfully prohibited from possessing firearms while he is engaging in criminal conduct by

using methamphetamine."); *see also United States v. Campbell*, No. 4:18CR23, 2020 WL 699821, at *4 (E.D. Tenn. Feb. 11, 2020).

### 2. Historical Analysis

To be certain, the Court will review historical research into statutes in the American legal tradition which are analogous to § 922(g)(3). *Heller* explicitly cautioned readers not to "doubt . . . longstanding prohibitions on the possession of firearms by felons and the mentally ill." *Heller*, 554 U.S. at 626. Such regulatory measures are "presumptively lawful." *See id.* at 627 n. 26. The Supreme Court echoed this in *McDonald v. Chicago*, 561 U.S. 742, 786 (2010) ("We repeat those assurances here," namely, "that our holding did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons and the mentally ill.'") (quoting *Heller*, 554 U.S. at 626). "In addition, *Heller* demonstrates that a regulation can be deemed 'longstanding' even if it cannot boast a precise founding-era analogue." *Nat'l Rifle Ass'n of Am. v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 700 F.3d 185, 196 (5th Cir. 2012) (citing *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010)).

In a pre-*Heller* case, the Fifth Circuit characterized § 922(g)(3) as a "'limited, narrowly tailored specific exception'" to the Second Amendment right which is "not inconsistent with the right of Americans generally to individually keep and bear their private arms as historically understood in this country." *United States v. Patterson*, 431 F.3d 832, 835-36 (5th Cir. 2005) (quoting *United States v. Emerson*,

270 F.3d 203, 261 (5th Cir. 2001)).[2]  The Fifth Circuit tethered its holding to the high-risk nature of drug abusers—"Congress may prohibit those who pose a risk to society, like felons, from exercising the right to bear arms," and "unlawful users of controlled substances pose a risk to society if permitted to bear arms."  *Patterson*, 431 F.3d at 835-836.  In an earlier decision, the Fifth Circuit had drawn upon numerous law review articles and other secondary sources to establish that § 922(g)'s restriction on possession of firearms by felons—another high-risk class— has a long and established history in English and American common law.  *Emerson*, 270 F.3d at 226 n. 21.[3]  The Fifth Circuit reaffirmed this holding in a post-*Heller* decision in 2013.  *See United States v. May*, 538 F. App'x 465, 466 (5th Cir. 2013) (citing *Patterson*, 431 F.3d at 836); *see also United States v. Moreno*, 811 F. App'x 219, 223 (5th Cir. 2020) (upholding Sentencing Guideline § 2D1.1(b)(1), which "increases a base offense level by two levels 'if a dangerous weapon (including a firearm) was *possessed*' in the course of an offense involving drugs," because "drug traffickers pose a risk to society that is enhanced by their possession firearms" and the enhancement "harmonizes with historical traditions regarding the Second Amendment") (emphasis in original).  District courts in the Fifth Circuit have also upheld the constitutionality of § 922(g)(3) since *Heller*.[4]

---

[2] *See also United States v. Roach*, 201 F. App'x 969, 974 (5th Cir. 2006) (repeating this holding).

[3] *See also Nat'l Rifle Ass'n*, 700 F.3d at 200-04 (discussing the historical foundations of modern firearm restrictions and noting "revolutionary and founding-era gun regulations . . . that targeted particular groups for public safety reasons").

[4] *See, e.g., Piscitello v. Bragg*, No. EP-08-CA-266-KC, 2009 WL 536898, at *3 (W.D. Tex. Feb. 18, 2009).

Other circuit courts have likewise upheld the constitutionality of § 922(g)(3) under *Heller*'s standards of history and tradition.  For instance, the Eighth Circuit collected various cases which found that § 922(g)(3) fell within *Heller*'s presumptively lawful category of historically attested firearm restrictions.  *See United States v. Seay*, 620 F.3d 919, 924-25 (8th Cir. 2010) (holding that "§ 922(g)(3) has the same historical pedigree as other portions of § 922(g) which are repeatedly upheld by numerous courts since *Heller*"); *see also United States v. Dugan*, 657 F.3d 998, 999 (9th Cir. 2011) (adopting the reasoning of *Seay* and *Yancey*, discussed *infra*, that § 922(g)(3) "embodies a long-standing prohibition of conduct similar to the examples listed in *Heller*"); *United States v. Richard*, 350 F. App'x 252, 260 (10th Cir. 2009) (upholding § 922(g)(3) as one of the "'presumptively lawful regulatory measures'" mentioned in *Heller*).

Perhaps the most robust discussion of the historicity of § 922(g)(3) is contained in *United States v. Yancey*, 621 F.3d 681 (7th Cir. 2010).  In that case, the Seventh Circuit began by noting that "[i]t was not until 1968 that Congress barred the mentally ill from possessing guns, and it was in that same legislation that habitual drug users were prohibited from having guns."  *Id.* at 683 (citing Gun Control Act of 1968, Pub. L. 90-618, § 102, 82 Stat. 1213, 1220).  However, Congress's disarmament of drug abusers did not occur in a vacuum; rather, "many states" had theretofore "restricted the right of habitual drug abusers or alcoholics to possess or carry firearms."  *Yancey*, 621 F.3d at 684.  "These statutes demonstrate that Congress was not alone in concluding that habitual drug abusers are unfit to

8

possess firearms." *Id.* And these prohibitions "are merely the latest incarnation of the states' unbroken history of regulating the possession and use of firearms dating back to the time of the amendment's ratification." *Id.*

The Seventh Circuit analogized disarmament of drug abusers to disarmament of felons, though it noted a debate in legal scholarship as to the extent to which felons were disarmed in American legal tradition. *Id.* at 684. The Court cited cases from the nineteenth century upholding statutes which disarmed "tramps," *see State v. Hogan*, 58 N.E. 572 (Ohio 1900), and "intoxicated persons," *see State v. Shelby*, 2 S.W. 468 (Mo. 1886). The Seventh Circuit ultimately concluded: "Whatever the pedigree of the rule against even nonviolent felons possessing weapons . . . most scholars of the Second Amendment agree that the right to bear arms was tied to the concept of a virtuous citizenry and that, accordingly, the government could disarm 'unvirtuous citizens.'" *Id.* at 684-85 (citing *United States v. Vongxay*, 594 F.3d 1111, 1118 (9th Cir. 2010)).[5] With the historical conclusion

---

[5] *See also Nat'l Rifle Ass'n*, 700 F.3d at 201, where, while summarizing the historical evidence relating to disarmament of dangerous persons, the Fifth Circuit said: "[t]hese categorical restrictions may have been animated by a classical republican notion that only those with adequate civic 'virtue' could claim the right to arms." *Id.* "Scholars have proposed that at the time of the founding, 'the right to arms was inextricably and multifariously linked to that of civic virtu[e] (i.e., the virtuous citizenry),' and that 'one implication of this emphasis on the virtuous citizen is that the right to arms does not preclude laws disarming the unvirtuous citizens (i.e., criminals) or those who, like children or the mentally imbalanced, are deemed incapable of virtue." *Id.* (citing Don B. Kates & Clayton E. Cramer, *Second Amendment Limitations and Criminological Considerations*, 60 HASTINGS L. J. 1339, 1359 (2009)). This observation comports with the Supreme Court's statements that the Second Amendment, as a threshold matter, covers only ordinary and responsible law-abiding citizens.

that dangerous or unvirtuous citizens could be disarmed, the Seventh Circuit produced sources corroborating Congress's finding that drug abusers are more likely to engage in gun violence and more likely to exhibit a dangerous lack of self-control. *Id.,* the Court found § 922(g)(3) constitutional.

## CONCLUSION

The Court finds that the analysis in *Yancey* demonstrates the historical attestation demanded by the *Bruen* framework. The appellate courts observe that "Congress enacted the exclusions in § 922(g) to keep guns out of the hands of presumptively risky people," *Yancey*, 621 F.3d at 683, and enumerated unlawful drug users and addicts amongst other similar classes. The Court need not repeat the Seventh Circuit's historical analysis in *Yancey*; it suffices to show that analogous statutes which purport to disarm persons considered a risk to society— whether felons or alcoholics—were known to the American legal tradition. *See, e.g., United States v. Carter*, 669 F.3d 411, 415 (4th Cir. 2012) ("Placed in the wrong hands, firearms present a grave threat to public safety, and for this reason, the Anglo-American right to bear arms has always recognized and accommodated limitations for persons perceived to be dangerous."). The Court therefore finds that 18 U.S.C. § 922(g)(3) passes constitutional muster under the legal framework articulated in *Heller* and *Bruen*.

**IT IS THEREFORE ORDERED AND ADJUDGED** that the [24] Motion to Dismiss filed by Defendant, Patrick Darnell Daniels, Jr. is **DENIED.**

**SO ORDERED AND ADJUDGED** this the 8th day of July, 2022.

s/ *Louis Guirola, Jr.*

LOUIS GUIROLA, JR.

UNITED STATES DISTRICT JUDGE