IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION


UNITED STATES OF AMERICA

VS.                          CRIMINAL NO.  1:22cr58-LG-BWR


PATRICK DARNELL DANIELS




VOLUME II

TRIAL PROCEEDINGS

BEFORE THE HONORABLE LOUIS GUIROLA, JR.
UNITED STATES DISTRICT JUDGE

JULY 25, 2022
GULFPORT, MISSISSIPPI

APPEARANCES:

FOR THE GOVERNMENT:
  JONATHAN BUCKNER, ESQUIRE
  ERICA ROSE, ESQUIRE
  U.S. ATTORNEY'S OFFICE - GULFPORT
  1575 20TH AVENUE
  GULFPORT, MISSISSIPPI  39501



FOR THE DEFENDANT:
  JOHN WEBER, ESQUIRE
  LEILANI TYNES, ESQUIRE
  FEDERAL PUBLIC DEFENDER - GULFPORT
  2510 14TH STREET, SUITE 902
  GULFPORT, MISSISSIPPI  39501



REPORTED BY:  SHERRI L. PENNY, RPR, FCRR
              2012 15TH STREET, SUITE 403
              GULFPORT, MISSISSIPPI  39501
              (228)563-1781

1                          **TABLE OF CONTENTS**

2                              **VOLUME II**

3    Preliminary Instructions to the Jury  .....................88

4        Exhibits G-1 through G-29 Admitted ..................102

5    Opening Statement by Mr. Buckner  ........................109

6    Opening Statement by Mr. Weber ...........................111

7    WITNESSES FOR THE GOVERNMENT:

8    RAY BELL

9        Direct Examination By Ms. Rose  ......................113

10       Cross-Examination By Mr. Weber  ......................130

11   SHANE LYNES

12       Direct Examination By Mr. Buckner  ...................139

13       Cross-Examination By Mr. Weber  ......................146

14   STEPHANIE ARMAS

15       Direct Examination By Ms. Rose  ......................147

16       Cross-Examination By Ms. Tynes .......................152

17   Reporter's Certificate ...................................170

18                              -  -  -

19

20

21

22

23

24

25

```
 1
 2        (PREVIOUS VOLUME I CONTAINS SEALED JURY VOIR DIRE)
 3             THE COURT:  Ladies and gentlemen of the jury, you are
 4   required to take an additional oath, and that is an oath to
 5   render a true and correct verdict based on the law and the
 6   evidence.  If you would please rise, raise your right hand and
 7   allow the clerk of the court to administer that oath.
 8        (JURY SWORN)
 9             THE COURT:  Thank you, ladies and gentlemen.  Please
10   be seated.
11        I was going to tell you what we're going to do for the
12   remainder of the morning, but the morning is gone, so I will
13   tell you what we're going to do for the next couple of hours.
14   First and foremost, I am going to -- when you go back to the
15   jury room, we have got menus in there for you so you can order
16   some lunch, and we're going to get you some lunch that you can
17   eat right here in the courthouse before we actually begin the
18   trial in earnest.
19        From time to time during this trial, the Court will be
20   providing you with instructions, and these are instructions on
21   the law.  And when I provide you with those instructions, you
22   have already told me and you have told the lawyers and the
23   litigants that you are going to follow the law, so I expect
24   that you will follow my instructions as well.
25        We will have some instructions before you leave the
```

1    courtroom, we call those the preliminary instructions.  Those

2    are instructions that will assist you during the trial itself,

3    tell you a little bit about the trial and the processes of the

4    trial.  It will also assist you in determining what your

5    conduct should be outside of the courtroom and how you should

6    comport yourself when you go home because you will not be

7    sequestered.

8         Please bear in mind that from time to time I will have to,

9    perhaps, meet with the lawyers or take care of other matters

10   that need to be taken up outside of your presence and you will

11   be asked to go back to the jury room.

12        Now, when you do recess here this morning -- this

13   afternoon for your lunch, we'll make available to you a

14   telephone because even though you knew you had to be here this

15   morning, you could not have anticipated that you would actually

16   be selected as a juror.  You may need to call your employer,

17   you may need to call your home, you may need to call your

18   children, make arrangements, I do not know.  But we want to

19   make arrangements for you to have the opportunity to call

20   someone and let them know where you will be.

21        In addition to that, I get asked this question all the

22   time:  Do I have to sit in the same seat?  No.  Sit anywhere

23   you would like to within the jury box where you feel

24   comfortable, and that I will leave entirely up to you.

25        When you do go back to the jury room, there will be

1    refreshments available for you, soft drinks, coffee, water,

2    those types of things.  And, gee, what else?  What other

3    housekeeping matters do I need to go over with you?  We'll also

4    have -- Stan reminds me -- you don't have to take notes.  But

5    if you would like to take notes, there will be writing

6    implements back there for you, pads, pens, pencils, whatever

7    you need for taking notes if you wish to do so.

8         Other than that, we'll play it by ear and take it as we

9    come along.  Sometimes I get asked, can I bring a Coke back

10   into the courtroom with me?  No, you can't do that.  Because if

11   you drop it, it becomes a mess.  But if you want to bring a

12   bottle of water back in the courtroom with you, you are

13   perfectly free to do that.  I think there are bottles, aren't

14   there, Vicki?  There are bottled waters.  If you want to bring

15   a bottled water back in here, go for it.

16        When you do leave the courthouse today, Stan will be your

17   liaison with the Court.  If you have got a question for me,

18   give it to him and he will bring it to me.  You're also going

19   to be provided with a pass so that you can park tomorrow in the

20   compound.  That means that you go through the secure gate and

21   you're able to park within what we call the compound.  The

22   chances of you running into any of the lawyers or any of the

23   witnesses or anybody at all that has anything to do with this

24   case are zero, because once you are in the compound, the Court

25   Security Officer will tell you where to assemble so he can

1  bring you up the elevators.  That eliminates a lot of stress

2  and problems.  All right, then.  We'll go through these

3  preliminary instructions.  Again, when you get back into the

4  jury room, if you need to make a phone call you may.  By all

5  means, order your lunches and we'll have those delivered to

6  you.

7  **PRELIMINARY INSTRUCTIONS TO THE JURY**

8         Members of the jury, now that you have been sworn I will

9  give you some preliminary instructions to guide you in your

10  participation in the trial.  It will be your duty to find from

11  the evidence what the facts are.  You and you alone will be the

12  judges of the facts.

13         You will then have to apply to those facts the law as the

14  Court will give it to you.  You must follow that law whether

15  you agree with it or not.  Perform these duties fairly.  Do not

16  let bias, sympathy or prejudice that you may feel toward one

17  side or the other influence your decisions in any way.   In

18  particular, do not let racial, ethnic, national origin or other

19  bias influence your decisions in any way.  Nothing the Court

20  may say or do during the course of trial is intended to

21  indicate or should be taken by you as indicating what your

22  verdict should be.

23         The evidence from which you will find the facts will

24  consist of testimony of witnesses, documents, and other items

25  received into the records as exhibits and any facts that the

1    lawyers may agree upon or stipulate to that the Court may

2    instruct you to find.

3        Certain things, however, are not evidence and must not be

4    considered by you, and I will list some of them for you now:

5        Number 1, statements, arguments, and questions by lawyers

6    are not evidence.

7        Number 2, objections to questions are not evidence.

8    Lawyers have an obligation to their clients to make objections

9    when they believe evidence is being offered which is improper

10   under the rules of evidence.  You should not be influenced by

11   the objection or by the Court's ruling on it.  If the objection

12   is sustained, ignore the question.  If it is overruled, treat

13   the answer like any other.  If you are instructed that some

14   item of evidence is received for a limited purpose only, then

15   you must follow that instructions.

16       Number 3, testimony that the Court has excluded or told

17   you to disregard is not evidence presented here in the

18   courtroom and should not be considered.

19       Number 4, anything that you may have seen, heard, or read

20   outside of the courtroom is not evidence and must be

21   disregarded.  You are to decide the case solely on the evidence

22   presented here and in the courtroom.

23       There are two kinds of evidence, direct and

24   circumstantial.  Direct evidence is direct proof of a fact,

25   such as the testimony of an eyewitness.  Circumstantial

1    evidence is the proof of facts from which you may infer or

2    conclude that other facts exists.  I will give you further

3    instructions on these, as well as other matters, at the end of

4    the case, but keep in mind that you may consider both kinds of

5    evidence.

6         It will be up to you to decide which witnesses to believe,

7    which witnesses not to believe, and how much of any witness'

8    testimony to accept or reject.  I will give you some guidelines

9    for determining the credibility of witnesses at the end of the

10   case.

11        As you know, this is a criminal case.  And there are three

12   basic rules about a criminal case that you must always keep in

13   mind.  First, the defendant is presumed innocent until proven

14   guilty.  The indictment brought by the government against the

15   defendant is only an accusation, nothing more.  It is not proof

16   of guilt or anything else.  The defendant therefore starts out

17   with a clean slate.

18        Second, the burden of proof is on the government until the

19   very end of the case.  The defendant has no burden to prove his

20   innocence or to present any evidence or to testify.  Since the

21   defendant has the right to remain silent, the law prohibits you

22   from arriving at your verdict by considering that the defendant

23   may not have testified.

24        And third, the government must prove the defendant's guilt

25   beyond a reasonable doubt.  I will give you further

instructions on this point later, but bear in mind that in this respect, a criminal case is different from a civil case.   I will give you detailed instructions on the law at the end of the case and those instructions will control your deliberations and your decisions.   But in order to help you follow the evidence, I will now give you a brief summary of the elements of the offense that the government must prove beyond a reasonable doubt to make its case.

Now, in this case the defendant is charged with knowingly possessing a firearm which was in and affecting interstate or foreign commerce while knowingly being an unlawful user of a controlled substance.

For you to find the defendant guilty of this crime, you must be convinced that the government has proved each of the following beyond a reasonable doubt:

First, that the defendant knowingly possessed a firearm as charged; second, that at the time the defendant possessed the firearm, the defendant was an unlawful user of any controlled substance; third, that the defendant knew he was an unlawful user of an illegal controlled substance; and fourth, that the firearm possessed traveled in interstate or foreign commerce. That is before the defendant possessed the firearm, it had traveled at some time from one state to another or between any part of the United States and any other country.

Now, the term "firearm" means any weapon that will be or

is designed or may readily be converted to expel a projectile by the action of an explosion.  The term "firearm" also includes the frame or receiver of any such weapon or any firearm muffler or firearm silencer or destructive device.

Marijuana is a controlled substance within the meaning of the law.  The phrase "unlawful user of a controlled substance" means a person who uses a controlled substance in a manner other than as prescribed by a licensed physician.  The defendant must have been actively engaged in the use of a controlled substance at the precise time he possessed the firearm.  Such use is not limited to the use of drugs on a particular day or within a matter of days or weeks before, but rather that the unlawful use has occurred recently enough to indicate that the individual is actively engaged in such conduct.  An inference that a person was a user of a controlled substance may be drawn from the evidence of a pattern of use or possession of a controlled substance that reasonably covers the time the firearm was possessed.

"Possession," as that term is used in these instructions may be of two kinds:  It may be actual possession or constructive possession.  A person who knowingly has direct physical control over a thing at a given time is in actual possession of it.  A person who, although not in actual possession, knowingly has both the power and the intention at a given time to exercise dominion or control over a thing, either

1   directly or through another person or persons, is in

2   constructive possession of it.

3        Possession may be joint or it may be sole.  If one person

4   alone has actual or constructive possession of a thing,

5   possession is sole.  If two or more persons share actual or

6   constructive possession of a thing, then possession is joint.

7   You may find the element of possession is present if you find

8   beyond a reasonable doubt that the defendant had actual or

9   constructive possession, either alone or jointly with others.

10        The word "knowingly," as that term has been used from time

11   to time in these instructions, means that the act was

12   voluntarily and intentionally, not because of mistake or

13   accident.

14        Ladies and gentlemen, a few words about your conduct as

15   jurors.  If you would like to take notes during the trial, you

16   may do so.  On the other hand, you are not required to take

17   notes if you prefer not to do so.  Each of you should make your

18   own decision about this.  If you do decide to take notes, be

19   careful not to get so involved in the note-taking that you

20   become distracted from the ongoing proceedings.  Your notes

21   should be used only as memory aids.  You should not give your

22   notes precedence over your independent recollection of the

23   evidence.  If you do not take notes, you should rely upon your

24   own independent recollection of the proceedings.  And you

25   should not be unduly influenced by the notes of other jurors.

1    Notes are not entitled to any greater weight than the memory or

2    impression of each juror as to what the testimony may have

3    been.  Whether you take notes or not, each of you must form and

4    express your own opinion as to the facts of the case.

5         Now, you will note that we have an official court reporter

6    making a record of the trial.  However, we will not have

7    typewritten transcripts of this record available for your use

8    in reaching a decision.

9         During the course of the trial, do not speak with any

10   witness or with the defendant or with any of the lawyers in the

11   case.  Please do not talk with them about any subject at all.

12   You may be unaware of the identity of everyone connected with

13   this case; therefore, in order to avoid even the appearance of

14   impropriety, do not engage in any conversation with anyone in

15   or about the courtroom or courthouse.  It is best that you

16   remain in the jury room during breaks in the trial, and do not

17   linger in the hall.

18        In addition, during the course of the trial do not talk

19   about the trial with anyone else, not your family, not your

20   friends, not the people with whom you work.  Also, do not

21   discuss this case among yourselves until I have instructed you

22   on the law and you have gone into the jury room to make your

23   decision at the end of the trial.  Otherwise, without realizing

24   it, you may start forming opinions before the trial is over.

25   It is important that you wait until all the evidence is

1    received and you have heard my instructions on the rules of law

2    before you deliberate among yourselves.

3         You, as jurors, must decide this case based solely on the

4    evidence presented here within the four walls of this

5    courtroom.  This means that during the trial you must not

6    conduct any independent research about the case, the matters in

7    the case, or the individuals or corporations involved in the

8    case.  In other words, you should not consult dictionaries or

9    reference materials, search the internet, websites or blogs, or

10   use any other electronic tools to obtain information about this

11   case or to help you decide the case.  Please do not try to find

12   out any information from any source outside the confines of the

13   courtroom.

14        I know that many of you use cell phones, the Internet and

15   other tools of technology.  You also must not talk to anyone at

16   any time about this case or use these tools to communicate

17   electronically with anyone about the case; this includes your

18   family, and your friends.  You may not communicate with anyone

19   about the case through any means, including your cell phone,

20   through an email, a BlackBerry, iPhone, text messaging,

21   SnapChat, Twitter or through any blog or website including

22   Facebook, Google, WhatsApp, or YouTube.  You may not use any

23   similar technology of social media even if I have not

24   specifically mentioned it here.

25        I expect you will inform me as soon as you become aware of

1    any other juror's violation of these instructions.  A juror who

2    violates these restrictions jeopardizes the fairness of these

3    proceedings and a mistrial could result which would require the

4    entire trial process to start over.

5         I will now give you a little roadmap to help you follow

6    what will happen over the entire course of the trial.  First,

7    the government will make an opening statement, which is simply

8    an outline to help you understand the evidence as it is

9    admitted.  Next, the defendant's attorney may, but does not

10   have to make an opening statement.  Opening statements are

11   neither evidence nor arguments.  The government will then

12   present its witnesses, and counsel for the defendant may

13   cross-examine them.  Following the government's case, the

14   defendant may, if he wishes, present witnesses whom the

15   government may cross-examine.  If the defendant decides to

16   present evidence, the government may introduce rebuttal

17   evidence.

18        After all of the evidence is in, the attorneys will

19   present their closing arguments to summarize and interpret the

20   evidence for you, and the Court will instruct you on the law,

21   the law that you must apply in reaching your verdict.

22        Now, ladies and gentlemen, I am going to go ahead now and

23   excuse you so that you can go back to the jury room as we

24   discussed, make a phone call if you need to, and by all means,

25   on your menus, order your late lunch, which will be delivered

1     to you in the jury room.  After you have had your lunch, we'll

2     reconvene, and we'll begin the trial in earnest.  Anything else

3     on behalf of the government at this time?

4             **MS. ROSE:**  No.

5             **THE COURT:**  Anything also on behalf of the defendant?

6             **MR. WEBER:**  No, Your Honor.

7             **THE COURT:**  Very well, then.  Ladies and gentlemen,

8     you may be excused.

9             **(JURY OUT AT 12:56 P.M.)**

10            **THE COURT:**  Thank you.  Please be seated.

11        I think it would only be fair to excuse you all as well so

12    that you can have a fair opportunity to go get something to

13    eat.  And I want to say come back at 2:00.  At 2:00, I will

14    take up the defendant's pending motion to dismiss the

15    indictment.  I will hear short, brief oral argument on the

16    issue.  I will hear briefly from the government as well, and

17    then I will give you my ruling before we proceed.  I can't

18    really think of anything else that I need to go over, but does

19    the government have anything else we need to go over before we

20    proceed?

21            **MR. BUCKNER:**  Your Honor, the government had filed a

22    motion in limine concerning the jury instructions.  The Court

23    already gave the preliminary instruction.  I understand we'll

24    have a jury charge conference later on.  So I think that the

25    Court could address that at that time, it's not necessary.

1         **THE COURT:**  That motion is premature.  I will take up

2    the jury instructions at the close of the case, assuming we get

3    that far.

4         **MR. BUCKNER:**  Yes, Your Honor.

5         **THE COURT:**  Anything else?

6         **MR. BUCKNER:**  Nothing, else Your Honor.

7         **THE COURT:**  Will you be ready with your first witness

8    right after opening?

9         **MS. ROSE:**  Yes, Your Honor.

10         **THE COURT:**  Does either side wish to invoke the Rule

11   of Sequestration?

12         **MR. BUCKNER:**  The government does, Your Honor.

13         **THE COURT:**  All right.  The Rule of Sequestration is

14   therefore invoked, that means that anyone who will testify in

15   the case must, of course, be excused.  That, obviously, does

16   not apply to the defendant and it does not apply to the

17   representative of the government here at counsel table.

18   Please, if there's someone that you anticipate that will

19   testify, help me enforce the rule because I don't know who is

20   who here, all right?  Anything else on of behalf of the

21   government?

22         **MS. ROSE:**  No, Your Honor.

23         **THE COURT:**  Mr. Weber, anything else that you think

24   we need to take up at this time on behalf of Mr. Daniels?

25         **MR. WEBER:**  Your Honor, no.  But I think the

1    government has a number of pictures I believe they intend to

2    introduce, it's on their exhibit list.  And I think we can get

3    together and perhaps preadmit those pictures.

4              **THE COURT:**  I think it would be, perhaps, a timesaver

5    if when we return, and after I have ruled on the defendant's

6    motion, if we can go ahead and admit all exhibits to which

7    there is no objection, both by the government and, if there are

8    any, by defendant.  So I'd ask that during this recess that you

9    go over those in the event that there are some available that

10   we can just go ahead and admit without objection and provide to

11   the clerk.

12        One other thing.  I know that there are firearms involved

13   that you will be bringing into the courtroom.  Let us -- I want

14   to be sure that they're safe, that is my greatest concern.  And

15   they will remain, even though they are admitted into evidence,

16   they will remain in the custody of the prosecution during the

17   trial, and even after the trial is concluded would leave to

18   substitute photographs.  Anything else?

19             **MS. ROSE:**  No.  Thank you, Your Honor.

20             **THE COURT:**  Mr. Weber, anything else that you can

21   think of?

22             **MR. WEBER:**  No, Your Honor.

23             **THE COURT:**  Great.  Well, enjoy our late lunch and

24   we'll be back at 2:00.

25        **(RECESS TAKEN AT 1:00 P.M.  UNTIL 2:17 P.M.)**

1          THE COURT:  Is the government ready to proceed?

2          MS. ROSE:  Yes, Your Honor.

3          THE COURT:  Is the defendant ready to proceed?

4          MR. WEBER:  Yes, Your Honor.

5          THE COURT:  Let's take up the easy stuff first.  I am

6   given to understand that you have all agreed on the

7   admissibility of all of the government's exhibits; is that

8   correct?

9          MR. WEBER:  Yes, Your Honor.

10         THE COURT:  Let's go over them, then.  Who is in

11  charge of that?  Ms. Rose.  And we'll go over the government's

12  exhibit list.  You can go down them.  I have got a list, but I

13  want to be sure I understand what they are, and you just tell

14  me what they are.

15         MS. ROSE:  Yes, Your Honor.

16         THE COURT:  Having some computer issues here, hold on

17  just a second.  There we go.  I have got on my list a G-1

18  through G-29; is that still accurate?

19         MS. ROSE:  Yes.

20         THE COURT:  Let's go through them one at a time.

21         MS. ROSE:  Yes, sir.  G-1 is a photo of the firearms

22  located inside the vehicle.  G-2 is a photo of marijuana blunts

23  located inside the vehicle.  G-3 is a photo of the missing tag

24  on the defendant's vehicle.  G-4 is a photo of the defendant's

25  vehicle from the driver's side.  G-5 is a photo of the driver

1   and front passenger compartments.  G-6 is a photo of the

2   driver's side view from the front.  G-7 is a photo of the VIN

3   for defendant's vehicle.  G-8 is a photo of the defendant's

4   vehicle on the passenger side.  G-9 is a photo of the front

5   passenger side compartment.  G-10 is a photo of the rear

6   passenger side compartment.  G-11 is a photo of the toolbox.

7   G-12 is a photo of the serial number of the assault rifle.

8   G-13 is a photo of the side-view of the assault rifle.  G-14 is

9   a photo of the overall view of the assault rifle.  G-15 is a

10  photo of the assault rifle manufacturer.  G-16 is a photo of

11  the assault rifle model.  G-17 is a photo of the assault rifle

12  from the other side view.  G-18 is a photo of the handgun as a

13  side-view.  G-19 is another photo of the handgun.  G-20 is a

14  photo of the handgun's serial number.  G-21 is a photo of the

15  handgun's manufacturer.  G-22 is another photo of the handgun

16  serial number.  G-23 is a photo of the defendant's driver's

17  license.  G-24 is the defendant's recorded interview.  G-24A is

18  the transcript of the defendant's recorded interview.  G-25 is

19  the American Tactical Rifle.  G-25A is the magazine that

20  accompanies that rifle.  G-25B is the ammunition that goes with

21  that rifle.  G-26 is the Springfield Armory Hellcat

22  9-millimeter firearm.  G-26A is the ammunition that goes to

23  that firearm.  G-26B is the magazine that goes to that firearm.

24  G-27 is the ATF firearm nexus report.  G-28 is the smoked

25  marijuana cigarettes, or blunts.  And G-29 is the DEA lab

1    report.

2         Ms. Tynes, Mr. Weber, on behalf of the defendant, it's my

3    understanding that you have no objection to the admission of

4    these exhibits; is that correct?

5              **MR. WEBER:**  That is correct, Your Honor.

6              **THE COURT:**  Very well.  Without objection,

7    Government's Exhibits number 1 through 29, inclusive of some

8    lettered exhibits as well, 1 through 29 will be marked and

9    admitted into evidence, again, without objection.

10        You can, of course, use those exhibits as you wish during

11   the presentation of the evidence.

12        (EXHIBITS G-1 THROUGH G-29 ADMITTED)

13             **MS. ROSE:**  Thank you, Your Honor.

14             **THE COURT:**  The next matter before the Court is the

15   defendant's second motion to dismiss the indictment.  Mr.

16   Weber, will you be arguing that on behalf of the defendant?

17             **MR. WEBER:**  Yes, Your Honor.

18             **THE COURT:**  You may proceed.

19             **MR. WEBER:**  Your Honor, we've filed a second motion

20   to dismiss the indictment arguing that 18, United States Code,

21   Section 922(g)(3) is unconstitutionally vague and in violation

22   of Mr. Daniels' due process rights.

23             **THE COURT:**  Why don't you just argue that from

24   counsel table.  We have got the lectern turned and that might

25   be clunky.

1          **MR. WEBER:**  If the Court doesn't mind, I can --

2          **THE COURT:**  Go right ahead.

3          **MR. WEBER:**  In our briefing, in our motion in our

4    briefing we pointed out to the Court that we believe 922(g)(3)

5    is facially vague.  We understand or acknowledge the current

6    law in the Fifth Circuit, a case of *Patterson*, which requires

7    that the defendant, in this particular case, first show that as

8    applied to his particular case, to his particular facts, as

9    applied that law is vague.  And that's -- I am not arguing that

10   that is the case here.  What I am suggesting is that under

11   *Johnson versus United States*, which is a case that analyzed the

12   Armed Career Criminal Act, Justice Scalia authored that opinion

13   and seemed to suggest that there is no need to, first, show an

14   as-applied violation of the defendant's due process rights, and

15   that the Court can address a facially vague challenge to the

16   statute.

17         And I am relying specifically on -- this is not John Weber

18   making this argument, this was a case that we found in the

19   District Court of Utah where a district court judge over there

20   found that 922(g)(3) was both facially and, as applied, vague

21   to that particular defendant.

22         I did not cite this in my brief, but there's a Fifth

23   Circuit case, *United States versus Herrera,* H-E-R-R-E-R-A, it's

24   a 2002 case.  The citation is 313 F.3d 882.  And there's a

25   strong dissent from Judge DeMoss joined by Judge Jerry Smith.

1    And that case, the *en banc* Fifth Circuit did not go into -- did

2    not even address the vagueness or as-applied constitutional

3    challenge to 922(g)(3); however, in the dissent, Judge DeMoss

4    talks about some of the similar issues or concerns that we

5    raise to the Court today, that is there is no statutory

6    definition of unlawful user.  Congress did not define this

7    particular term, and therefore what is the Court going to rely

8    on to define what is an unlawful user.

9        I don't know if the Court is in a position to even address

10   that particular facially vague argument because of the status

11   of the Fifth Circuit law, but if the Court were to address the

12   facial challenge to the statute, the Court would find that

13   Congress has not defined that term "unlawful user," and that's

14   essentially why we're here today is to try to figure out what

15   that term means.  And I know the Court has given a preliminary

16   instruction to the jury, but in fashioning jury instructions or

17   proposed jury instructions to the Court, that was something

18   that we wrestled with as to how to properly instruct a jury as

19   to what that term means, and that, of course, in essence, is

20   our argument as to why this statute, why 922(g)(3) is vague.

21            **THE COURT:**  All right.  Thank you, Mr. Weber.  What

22   says the government?

23            **MR. BUCKNER:**  Your Honor, I think as defense counsel

24   has at least implied, the Fifth Circuit's precedent establishes

25   that you have to show an as-applied challenge before you can

1    bring a facially vague challenge to a statute.  And in this

2    case, there is no dispute that an ordinary person would

3    understand that smoking marijuana 14 times a month for several

4    years would qualify one's self as an unlawful user of a

5    controlled substance.  So because the Fifth Circuit has made it

6    clear in both *Patterson* and *May*, both of which were cited in

7    the government's response, that you have to be able to show an

8    as-applied violation before you reach that facial argument, the

9    motion to dismiss should be denied.  Thank you, Your Honor.

10            **THE COURT:**  Thank you, Mr. Buckner.  Do you wish to

11   respond, Mr. Weber?

12            **MR. WEBER:**  No, Your Honor.

13            **THE COURT:**  I think you will concede, Mr. Weber, that

14   the Court must follow the *Johnson* line of cases in determining

15   whether or not Mr. Daniels can bring a facial as-applied

16   challenge to the statute.  I think that's what you said.

17            **MR. WEBER:**  I said, Your Honor, that the law in the

18   Fifth Circuit under *Patterson* requires that Mr. Daniels find

19   that the law, as applied to the facts and circumstances of his

20   case, is vague; in other words, the conduct at issue in this

21   particular case is at the core concern or reason, or seems to

22   be the reason why Congress passed this law or implemented this

23   particular law.

24            **THE COURT:**  All right.  I am not in agreement with

25   the District Court decision in the district in Utah, and I am

1    not in a position to adopt that District Court's analysis on

2    the challenge to the statute there.  I am constrained, instead,

3    by a couple of cases within the Fifth Circuit, and I am also

4    persuaded by a case out of the Eighth Circuit Court of Appeals.

5    And I start with your contention that *Johnson* somehow has

6    changed this landscape with facial challenges to the

7    constitutionality of a statute.  There's a follow-up case to

8    the *Johnson* case, which was decided in 2015, it's called *United*

9    *States versus Westbrooks*, that's at 858 F.3d 317, where the

10   Fifth Circuit basically, and I quote, said that "*Johnson* did

11   not change the rule that defendant whose conduct is clearly

12   prohibited cannot be the one making that challenge."  I am also

13   persuaded once again by a case out of the Eighth Circuit, it's

14   a 2016 case, *United States versus Bramer*, B-R-A-M-E-R, that's

15   at 832 F.3d 908.

16        Now, in *Bramer* the Eighth Circuit held that under the

17   *Johnson* factors, that *Bramer* need not prove that 922(g)(3) is

18   vague in all its applications to succeed on a facial challenge,

19   but the law did still require him to show that the statute is

20   vague as applied to his particular conduct before bringing that

21   facial challenge.  Because *Bramer* admitted in his written plea

22   agreement to being an unlawful user of marijuana while in

23   knowing possession of at least three firearms, there was no

24   basis in the record to conclude that the term "unlawful user of

25   a controlled substance" was unconstitutionally vague as applied

1    to him.

2         Therefore, I am going to deny your motion at this time.

3    And let me point out that what's concerning the Court here is I

4    don't have the facts before me to determine what the facts are

5    as they relate to Mr. Daniels.  So even though your motion is

6    denied, you will, of course, have other opportunities within

7    which to make, perhaps, a motion for judgment of acquittal at

8    the conclusion of the government's case, at which time we'll

9    have at least before us those facts from which the Court can

10   conclude whether a facial challenge has been made.  And that's

11   the ruling of the Court.

12         **MR. WEBER:**  Yes, Your Honor.  Thank you.

13         **THE COURT:**  You're not prejudiced in any regards in

14   your ability to bring a similar challenge after the government

15   concludes its case.

16       I am given to understand that the lunches are late.  They

17   are here.  That still makes them late.  And I want to give the

18   jury a full opportunity within which to eat and relax and take

19   it easy.  So everyone needs to stay close.  We're going to be

20   on the jury's clock.  When they're ready -- I am getting a 3

21   signal from the court security officer, that's about half an

22   hour from now, more or less.  That may be the clock which we

23   use.

24       Is there anything else that we need to take up on behalf

25   of the government before we, again, take a recess to await the

```
 1    jury's, we'll call it a feeding, the jury's noon recess?

 2              MS. ROSE:  No.  Thank you, Your Honor.

 3              THE COURT:  Who is going to make opening statement on

 4    behalf of the government?

 5              MR. BUCKNER:  I will, Your Honor.

 6              THE COURT:  And who will make opening statement on

 7    behalf of the defendant?

 8              MR. WEBER:  I will, Your Honor.

 9              THE COURT:  I presume you are going to take that

10    right after the government?

11              MR. WEBER:  Yes, Your Honor.

12              THE COURT:  And who will be your first witness after

13    opening statement?

14              MS. ROSE:  It will be Task Force Officer Bell.

15              THE COURT:  Is there anything else that we need to

16    take up on behalf of the defendant before we take up another

17    short recess?

18              MR. WEBER:  No, Your Honor.

19              THE COURT:  Then we'll be in recess awaiting the

20    jury's pleasure.  We're in recess.

21         (RECESS TAKEN AT 2:32 P.M.  UNTIL 3:03 P.M.)

22              THE COURT:  Is the government ready to proceed?

23         MS. ROSE:  Yes, Your Honor.

24              THE COURT:  Defendant ready to proceed?

25              MR. WEBER:  Yes, Your Honor.
```

1          **THE COURT:**  Very good.  Please bring in the jury.

2          **(JURY IN AT 3:04 P.M.)**

3          **THE COURT:**  Good afternoon, ladies and gentlemen.  I

4     hope that you had -- that you were able to enjoy your lunch.

5     The parties have indicated to the Court that they are ready to

6     proceed.  You may make your opening statement on behalf of the

7     government.

8          **MR. BUCKNER:**  May I take the lecturn, Your Honor?

9          **THE COURT:**  Of course.

10               **OPENING STATEMENT BY THE GOVERNMENT**

11          **MR. BUCKNER:**  May it please the Court, counsel

12    opposite, ladies and gentlemen of the jury.  The evidence and

13    testimony that you see and hear in this case will show that on

14    or about April 25 of 2022, the defendant, Patrick Darnell

15    Daniels, Jr., was an unlawful user of a controlled substance in

16    possession of a firearm.

17          Now, you may be wondering how will the evidence and

18    testimony show that.  Well, the evidence will show that on

19    April 25 of 2022, law enforcement officers in Hancock County,

20    Mississippi, pulled over an F-150 pickup truck for operating

21    without a license plate.  Mr. Daniels was the only person

22    inside the truck.  When officers approached, they smelled the

23    odor of smoked marijuana coming from the vehicle.  They

24    searched the car.  And during the course of searching the

25    vehicle, they located two firearms.  One was a Springfield

1    Armory 9-millimeter pistol, it was loaded.  You will get to see

2    it today.  One was an American Tactical assault-style rifle.

3    It was also loaded.  It had a 30-round magazine.  You will get

4    to see that one today, too.  Officers also located what they

5    believe to be marijuana blunts or cigarettes smoked in the

6    ashtray of the vehicle.

7        After the traffic stop, Mr. Daniels spoke with police and

8    he admitted that he had smoked marijuana approximately 14 days

9    a month since he graduated from high school.

10       He also admitted that he possessed both of the guns that

11   were found in the vehicle.  He admitted it, he said, yeah, I

12   possess both of those firearms.  Now, the investigation didn't

13   conclude with Mr. Daniels' confession.  You will also hear

14   testimony about how the two guns were examined and researched

15   by a special agent with the Bureau of Alcohol, Tobacco,

16   Firearms & Explosives.  His name is Shane Lynes.  He is going

17   to explain to you how he examined those weapons, conducted the

18   research to determine where they were manufactured.  Because

19   remember at the beginning of the case, Judge Guirola gave you

20   some instructions about how the guns needed to move across

21   state lines or from another country into this country.  So

22   Agent Lynes is going to tell you where those guns were made.

23   They weren't made in Mississippi.  One of them was made in

24   Indiana and one of them was made in Croatia.  So in order to be

25   in Mr. Daniels' truck in Hancock County, they had to move

1    across the state lines and/or from one country into the United

2    States.

3        So you're going to hear that testimony, too.  Now, you

4    will recall I told you that officers smelled the odor of smoked

5    marijuana, and when they stopped Mr. Daniels they also found

6    some marijuana blunts, cigarettes.  You're also going to hear

7    some testimony from the DEA chemist, a chemist with the Drug

8    Enforcement Administration laboratory, and she's going to

9    explain how she tested those smoked blunts and it came back

10   marijuana, which was consistent with Mr. Daniels own admission

11   that he smoked marijuana.

12       Finally, at the conclusion of this trial, based upon all

13   the evidence and testimony that you have heard, seen and heard,

14   the government is going to ask that you find that on or about

15   April 25 of 2022, the defendant, Patrick Darnell Daniels, Jr.,

16   was an unlawful user of a controlled substance in possession of

17   a firearm.  And the government is going to ask that you return

18   a verdict of guilty.  Thank you.

19       **THE COURT:**  Thank you, Mr. Buckner.  Mr. Weber, you

20   may make an opening statement on behalf of Mr. Daniels.

21                **OPENING STATEMENT BY THE DEFENDANT**

22       **MR. WEBER:**  Something is missing.  Something is

23   missing.  That's what you're going to say at the end of the

24   government's case.  This case is about marijuana.  This case

25   involves guns.  This case involves a legal definition of user

1    that the judge is going to give you an instruction as to the

2    definition of that.  And as you heard the judge say, your job

3    is to listen and determine the facts and apply the law and come

4    up with a verdict, a decision.

5        Did the government prove their case, each and every

6    element of the offense, beyond a reasonable doubt.  That's your

7    job, ladies and gentlemen.  And in this case, when they finish

8    providing you the evidence and the testimony, you're going to

9    scratch your head and you're going to have a lot of questions

10   because something is missing.  What's missing is proof beyond a

11   reasonable doubt that Patrick Daniels is an unlawful user of

12   marijuana in possession of a firearm.

13       You're going to have no proof beyond a reasonable doubt

14   that he meets that definition that the government has provided

15   you evidence that you can make that conclusion.  And when you

16   uphold your oath to hold them to their burden, there's only one

17   conclusion, and that is that Patrick Daniels is not guilty of a

18   violation of 922(g)(3), being an unlawful user in possession of

19   firearms.

20       Thank you for your attention.  Thank you for the time that

21   you have taken to participate in our system of justice.  As the

22   judge said, it's the best in the world, it's not perfect.  But

23   I am excited that you get to be here and participate and be a

24   part of this great judicial system that we're all proud to be a

25   part of.  Thank you.

1          **THE COURT:**  Thank you, Mr. Weber.

2      You may call your first witness.

3          **MS. ROSE:**  Thank you, Your Honor.  The government

4  calls Task Force Officer Ray Bell.

5      (Oath Administered)

6          **THE COURT:**  You may proceed.

7                        **RAY BELL,**

8  **having first been duly sworn, testified as follows:**

9                   **DIRECT EXAMINATION**

10 BY MS. ROSE:

11 Q.  Good afternoon.

12 A.  Good afternoon.

13 Q.  Could you please state your name and spell your last name

14 for the record?

15 A.  First name is Ray William Bell, B-E-L-L, Jr.

16 Q.  What do you do for a living, Mr. Bell?

17 A.  I am a task force officer for DEA by way of Hancock County

18 Sheriff's Office.

19 Q.  What does that mean?

20 A.  Well, I work full time for Hancock County Sheriff's

21 Office, and I am tasked out to the DEA to work federal cases.

22 Q.  How long have you been doing that?

23 A.  Since January 3 of 2017.

24 Q.  And that whole time with Hancock County?

25 A.  No, ma'am.  I was with Long Beach at one point.

1   Q.   Long Beach here --

2   A.   Long Beach Police Department.

3   Q.   And what about before that?

4   A.   I did 20 years with Long Beach.

5   Q.   Okay.  So how long have you been a law enforcement officer

6   overall?

7   A.   Since August 1st of 2002.

8   Q.   Okay.  And were you working as a task force officer

9   assigned to the DEA on April 25 of this year?

10  A.   Yes, ma'am.

11  Q.   And on that date, did you encounter someone by the name of

12  Patrick Darnell Daniels, Jr.?

13  A.   I did, yes, ma'am.

14  Q.   Could you tell us about that encounter?

15  A.   Yes, ma'am.  Myself and another agent were on patrol

16  duties over in Hancock County.  And noticed Mr. Daniels'

17  vehicle operating on the roadway without a licensed tag.  We

18  conducted a traffic stop, at which point noticed the odor of

19  marijuana coming from within the vehicle.  Probable cause

20  search of the vehicle yielded the firearms and taking Mr.

21  Daniels into custody.

22  Q.   Where were the firearms located in the vehicle?

23  A.   The first firearm, which is the handgun, it was located

24  between the driver's seat and the center console.  The rifle

25  was behind -- it was in the backseat compartment of the truck.

1    Q.  What do you mean by "compartment"?

2    A.  Like the truck was four doors, so the front two doors

3  would be where Mr. Daniels was sitting, and the back two doors

4  is where the rifle was.

5    Q.  Located where?

6    A.  Like right behind -- if this is the center console of the

7  truck (indicating), the rifle was laying this way like on the

8  items that was on the backseat compartment area of the truck.

9    Q.  Within reach of the driver?

10    A.  Yes.

11    Q.  And what else was found in the vehicle?

12    A.  We found marijuana blunts that were in the ashtray.

13    Q.  Tell us more about that.

14    A.  It was multiple.  Whenever we spoke further with Mr.

15  Daniels about it.  He used the word "corral."  He indicated

16  that he was living out of his vehicle and he was trying to get

17  everything together and indicated that he just kind of took

18  some things out of the ashtray and left those in the ashtray

19  and vacuumed his passenger seat area.

20    Q.  And this was a statement that he made --

21    A.  Post-*Miranda*.

22    Q.  Okay.  How many statements did he make to you?

23    A.  He made one statement on scene, which was post-*Miranda*.

24  Then he made another statement, which was audio recorded

25  post-*Miranda* at DEA.

DIRECT - BELL

1   Q.   And you're using the term "post-*Miranda*."  Can you just

2   elaborate what that means for the jurors, please?

3   A.   Yes, it's when I advise a defendant of their rights and

4   then I speak to them after that.

5   Q.   And what statements did he make at that actual stop?

6   A.   He advised me that he was living out of his vehicle.  He

7   advised me that he was on hard times, and he advised me that

8   the firearms were his.  One of the firearms belonged to a

9   friend of his that is no longer living, and another -- the

10  other firearm, which is the handgun, that firearm was given to

11  him as a Father's Day gift from his girlfriend.

12  Q.   And did he make any admissions with respect to the use of

13  marijuana?

14  A.   Yes, he did.  When asked how current or how often he

15  smokes marijuana, he indicated 14 days out of the month.

16  Q.   Did he tell you how long he's been smoking marijuana?

17  A.   Yes, ma'am.  In the statement at DEA, he indicated since

18  high school, when he graduated high school.

19  Q.   Okay.  After you recovered the firearms and the marijuana

20  blunts, then what did you do?

21  A.   I took photos of the evidence and the vehicle, and we took

22  custody of Mr. Daniels.

23          **MS. ROSE:**  Your Honor, may I approach the evidence?

24          **THE COURT:**  Of course.

25          **MS. ROSE:**  And may I approach the witness?

**BY MS. ROSE:**

Q.  Officer Bell, I just handed you what's been marked as
Government's Exhibits 1 through 23.  Would you mind just taking
a look through those?

A.  Yes, ma'am.

Q.  Are those the photos that you just referenced?

A.  They are, yes, ma'am.

Q.  Are those all the photos that you took that day?

A.  Yes, ma'am.

Q.  And are they fair and accurate representations of the
scene as you saw it?

A.  Yes, ma'am.

        **MS. ROSE:**  Your Honor, may I have permission to
publish those photos?

        **THE COURT:**  You may.

**BY MS. ROSE:**

Q.  Are you able to see that?

A.  I am, yes, ma'am.

Q.  I am showing you what's been marked as Government's
Exhibit G-1.  What are we looking at here?

A.  This is the driver's seat of Mr. Daniels' vehicle.  You
will notice the rifle that is propped up.  I moved that rifle
in that position.  In fact, everything that is in this photo
here that's depicted, I put there.  The marijuana blunts are
currently bagged down here on the floor, on the floorboard.

1   And I just kind of took everything to put there to corral for

2   an overall photo.

3   Q.   Okay.   I'm going to show you now what's been marked as

4   G-2.   What are we looking at here?

5   A.   Those are the marijuana blunts with ammunition under it.

6   But in the bag right there is the marijuana blunts that were

7   located in the ashtray of Mr. Daniels' vehicle.

8   Q.   And I am showing you G-3.

9   A.   That is a photo of the rear end of Mr. Daniels' vehicle

10  without a tag, without a license plate.

11  Q.   And that's the reason you stopped him?

12  A.   That is correct.

13  Q.   And what do we have in G-4?

14  A.   It's just an overall view of the driver's side from the

15  rear of -- standing at the rear of Mr. Daniels' vehicle.

16  Q.   And now looking at G-5.

17  A.   This would depict the front driver's and front passenger

18  compartment of the vehicle.

19  Q.   And G-6?

20  A.   This is a photo standing at the front driver's side

21  facing, or pointing back towards the rear to get an overall

22  shot of the driver's side of the vehicle.

23  Q.   And G-7?

24  A.   Would be the VIN for the vehicle.

25  Q.   And G-8?

1   A.   Going to be an overall shot of the passenger side of the

2   vehicle.

3   Q.   G-9?

4   A.   Going to be looking inside the passenger front compartment

5   of the vehicle.

6   Q.   And G-10?

7   A.   That's going to be looking in the rear compartment of the

8   vehicle on the passenger side.

9   Q.   And looking at G-11?

10  A.   That's going to be the toolbox that was in the back, or

11  the bed portion of Mr. Daniels' vehicle.

12  Q.   And what is the significance of some of these photos that

13  you have taken with respect to the toolbox, the open vehicle

14  doors, the VIN number, etcetera?

15  A.   It's evidentiary.  It gives a view.  I can't just take the

16  vehicle and put it anywhere, so we take photos to document the

17  evidence and what we were seeing.

18  Q.   Okay.  I am now showing you what's been marked as G-12.

19  What are we looking at here?

20  A.   That is going to be the serial number of the American

21  Tactical rifle that was located in Mr. Daniels' vehicle.

22  Q.   Okay.  And with respect to G-13?

23  A.   It's going to be a side-view, I believe this is just

24  before being zoomed in, on the serial number of the rifle.

25  Q.   And what are we looking at in G-14?

DIRECT - BELL

1    A.   That's going to be an overall view of the rifle itself.

2    Q.   And what about G-15?

3    A.   That's going to show the brand of the rifle, and it is an

4    American Tactical.

5    Q.   And now looking at G-16, what are we seeing here?

6    A.   It's going to be the model of the rifle.

7    Q.   And Exhibit G-17?

8    A.   It's going to be the opposite side.  And again, it's going

9    to be just before zoomed in on the model.

10   Q.   What about G-18?

11   A.   That's going to be the Hellcat handgun that was located in

12   Mr. Daniels' vehicle.

13   Q.   And G-19?

14   A.   Going to be another overall shot of the Hellcat, same

15   thing.

16   Q.   And looking at G-20?

17   A.   That's going to be the serial number on the Hellcat

18   handgun.

19   Q.   And with respect to G-21?

20   A.   That's going to be the opposite side of the handgun

21   overall.

22   Q.   And what are we looking at in G-22?

23   A.   That's going to be the serial number for the handgun.

24   Q.   And last but not least, Government's G-23?

25   A.   That's going to be the identification card, Mississippi ID

 1    card for Mr. Daniels.

 2    Q.  And you previously mentioned that you interviewed the

 3    defendant also at the station?

 4    A.  Yes, that is correct.

 5    Q.  And do you see the person that you interviewed here in the

 6    courtroom today?

 7    A.  Yes, it's Mr. Daniels.

 8    Q.  Could you please point him out and describe what he is

 9    wearing?

10    A.  Mr. Daniels is wearing a white shirt with a blue tie.

11         **MS. ROSE:**  May the record reflect that he has

12    identified the defendant?

13         **THE COURT:**  So reflected.

14         **MS. ROSE:**  Thank you.

15    **BY MS. ROSE:**

16    Q.  So you recorded that interview; is that correct?

17    A.  We did, yes, ma'am.

18    Q.  And have you listened to that interview?

19    A.  I have, yes, ma'am.

20    Q.  And is it a fair and accurate production of the interview

21    that you had that day?

22    A.  Yes, ma'am.

23    Q.  All right.

24         **MS. ROSE:**  With the Court's permission, I'd like to

25    play G-24.  And I do have transcripts as well that are G-24A.

```
1    I don't know --

2              THE COURT:  Do you have copies for the jury?

3              MS. ROSE:  I do, in fact, Your Honor.

4              THE COURT:  Stan, if you would give a copy of the

5    transcript of this recording to each member of the jury.

6              MS. ROSE:  Your Honor, may I go back to the table to

7    get our copy of the transcript?

8              THE COURT:  I'm sorry, I am not able --

9              MS. ROSE:  May I approach the evidence?

10             THE COURT:  Of course you can.

11             MS. ROSE:  And may I approach the witness?

12             THE COURT:  Let's slow down a little bit.  Do you now

13   intend to play the recording?

14             MS. ROSE:  Yes, Your Honor.  Before I do that, I

15   would like to ask just a couple of questions about the

16   transcript if possible?

17             THE COURT:  If you wish, go ahead.

18             MS. ROSE:  Thank you, Your Honor.  May I approach

19   Mr. Bell?

20             THE COURT:  Yes.

21   BY MS. ROSE:

22   Q.  I am showing you what's been marked G-24A.  Are you

23   familiar with that document?

24   A.  I am.

25   Q.  And what is it?
```

1   A.   That is a transcript excerpt from the post-*Miranda*

2   interview of Mr. Daniels at the DEA office on April 25th, 2022.

3   Q.   And did your office prepare that?

4   A.   Yes.

5   Q.   And is it a fair and accurate transcript of what's in the

6   recording?

7   A.   Yes, ma'am.

8          **MS. ROSE:**   Your Honor, may I have permission to play

9   G-24?

10         **THE COURT:**   Now you're ready to play it?

11         **MS. ROSE:**   Yes, sir.

12         **THE COURT:**   I am having a little trouble hearing you,

13  it's probably my fault.  But before you play the recording, I

14  need to instruct the jury on how they're to consider it.

15       Ladies and gentlemen, there is an instruction that I need

16  to give to you on the manner in which you should consider the

17  evidence that you are about to hear.

18       Exhibit Number 24 has been identified -- I'm sorry, 24A

19  has been identified as a typewritten transcript of the oral

20  conversation which can be heard on a tape recording received in

21  evidence as Exhibit Number 24.  The transcript also purports to

22  identify the speakers engaged in this conversation.

23       Now, I have admitted these transcripts for the limited and

24  secondary purpose of aiding you in following the content of the

25  conversation as you listen to the tape recording and also to

1   aid you in identifying the speakers.  You are specifically

2   instructed that whether the transcript correctly or incorrectly

3   reflects the content of the conversation, or the identity of

4   the speakers is entirely for you to determine based upon your

5   own evaluation of the testimony you have heard concerning the

6   preparation of the transcript and from your own examination of

7   the transcript in relation to your hearing of the tape

8   recording itself as the primary evidence of its own contents.

9   And if you should determine that the transcript is in any

10  respect incorrect or unreliable, you should disregard it to

11  that extent.  It is what you hear on the tape that is evidence,

12  not the transcripts.  You may proceed.

13          **MS. ROSE:**  Thank you, Your Honor.

14      (Audio Recording Played).

15  **BY MS. ROSE:**

16  Q.  Was that your entire interview?

17  A.  No.

18  Q.  I'm sorry.  Was that the conclusion of your interview?

19  A.  Yes.

20  Q.  On the interview, the first voice that we hear, who is

21  that?

22  A.  That's me.

23  Q.  And then the second voice?

24  A.  It is Patrick Daniels.

25  Q.  And then the third voice?

1    A.  It's going to be Keith Chappel, Special Agent with the

2    DEA.

3    Q.  In the interview, the defendant references something, the

4    last time we met at Circle K?

5    A.  Yes.

6    Q.  What is he referring to?

7    A.  Whenever I was in training, whenever I moved over to

8    Hancock County, I was in training learning the roads and

9    getting familiar with the area.  We had an occasion to come

10   into contact with Mr. Daniels, at which time he was found with

11   multiple bags of marijuana and firearms with him at that time

12   as well.

13   Q.  And did he admit being a user of marijuana on that

14   occasion?

15   A.  Yes.

16   Q.  And when was that?

17   A.  I believe it was March 8th.  I started there March 7th, I

18   think it was either March 8th or March 9th.

19   Q.  Of this year?

20   A.  Yes.

21   Q.  Okay.  I am going to show you what's been marked as

22   Government's Exhibit G-25.

23            **MS. ROSE:**  May I approach him, Your Honor?

24            **THE COURT:**  You may.

25   **BY MS. ROSE:**

DIRECT - BELL

1    Q.   What are we looking at here, Mr. Bell?

2    A.   This is the Mil Sport 556 rifle.

3    Q.   And is that the one that you recovered from the vehicle?

4    A.   It is, yes, ma'am.

5    Q.   And when you recovered it, was it in that exact condition?

6    A.   Minus the zip ties, the tag and the sticker, yes.

7    Q.   Did it have a magazine with it?

8    A.   It did, yes.

9    Q.   Was the magazine affixed to the firearm?

10   A.   It was.  It was engaged into the port here, and it

11   contained 20 rounds of 556 ammunition.

12           **MS. ROSE:**  Your Honor, may I approach?

13           **THE COURT:**  You may.

14   **BY MS. ROSE:**

15   Q.   I am going to show you what's been marked as G-25A and

16   G-25B.  Do you recognize those items?

17   A.   Yes, ma'am.

18   Q.   And what are they?

19   A.   This is the magazine.  Government's Exhibit G-25A is the

20   magazine that was inserted into the rifle and contained.

21   Government's Exhibit G-25B, which is the 556 ammunition.

22   Q.   And is that the ammunition that goes to that firearm?

23   A.   It is, yes, ma'am.

24   Q.   And they're in -- two of those items are in bags; is that

25   correct?

1    A.   That is correct.

2    Q.   Did you put those items in those bags?

3    A.   Yes, ma'am.

4    Q.   Did you write your name on them or anything?

5    A.   Right here (indicating).  Acquired by, sealed by,

6    witnessed by.

7    Q.   And that's all you?

8    A.   With the exception of the witnessed by, and I believe the

9    other one is going to be Keith Chappell.  I can't read the

10   handwriting, but I believe it's Keith Chappell as the witness.

11          **MS. ROSE:**  Your Honor, may I approach again?

12   **BY MS. ROSE:**

13   Q.   I am going to now show you what's been marked G-26, as

14   well as G-26A and G-26B.  Do you recognize those items?

15   A.   Yes, ma'am, I do.

16   Q.   And what is G-26?

17   A.   G-26 is the Hellcat handgun that was located in Mr.

18   Daniels' vehicle.

19   Q.   And what about G-26A?

20   A.   G-26A is the ammunition that was loaded into G-26B, which

21   was also loaded into the firearm.

22   Q.   And what is G-26B?

23   A.   G-26B is the magazine.

24   Q.   G-26A, ammunition, was inside G-26B which was affixed to

25   the firearm?

1    A.   Correct.

2    Q.   So when you found both of these firearms, they were

3    loaded?

4    A.   Yes, ma'am.

5    Q.   And is your name on those bags as well?

6    A.   Yes, ma'am.

7    Q.   Once you recovered those firearms, what did you do with

8    them?

9    A.   I take them back to DEA.  We processed the firearms by way

10   of taking photos of the firearms.  We separate the ammunition

11   from the magazine and from the firearm itself, ultimately

12   processing it into a bag to insert it, or I'm sorry, to submit

13   it to our non-drug evidence custodian at DEA.

14   Q.   Does anything else happen with the firearm?

15   A.   Yes, the firearm was test fired.  In fact, both of them

16   were test fired.  I also ran eTrace reports, and I also

17   submitted specific information about the firearms to a special

18   agent of the ATF, Shane Lynes.

19   Q.   What is an eTrace report?

20   A.   An eTrace report, it gives me back information about the

21   firearm, where it was purchased from originally, where it came

22   from.

23   Q.   Okay.  And then you said you gave it to the ATF agent?

24   A.   I did, yes, ma'am, so that he could also do his report.

25   Q.   And that's with both firearms?

1    A.   Correct.

2    Q.   Okay.

3           **MS. ROSE:**   May I approach again, Your Honor?

4    **BY MS. ROSE:**

5    Q.   I'm going to show you what's been marked as G-28.   What

6    are we looking at here?

7    A.   This is the marijuana blunts that were located inside Mr.

8    Daniels' vehicle.

9    Q.   And is your name also on that bag?

10   A.   It is, yes, ma'am.

11   Q.   What did you do with those blunts?

12   A.   Same as with the firearms.   We take them back to the

13   office, we'll process them, we'll take photos of it, and then

14   we'll submit it to our crime lab for their analysis.

15   Q.   And is that what you did in this case?

16   A.   Yes.

17           **MS. ROSE:**   May I have just a moment, Your Honor?

18   **BY MS. ROSE:**

19   Q.   In the course of your investigation, did you ascertain how

20   old Mr. Daniels is?

21   A.   Twenty-six years of age.

22   Q.   And that's how old he was on April 25th?

23   A.   That is correct.

24   Q.   And on April 25th of this year, would Mr. Daniels have had

25   any legal reason to be using marijuana?

CROSS - BELL

1    A.  No.

2    Q.  But he was using it at the time of your stop?

3    A.  Yes.

4    Q.  And all of this occurred in Hancock County in the Southern

5    Division of the Southern District of Mississippi?

6    A.  Yes, ma'am.

7         **MS. ROSE:**  I have no further questions, Your Honor.

8         **THE COURT:**  Cross-examination?

9                        **CROSS—EXAMINATION**

10   **BY MR. WEBER:**

11   Q.  I want to start off with a question based on the last

12   question that Ms. Rose asked you.

13   A.  Yes, sir.

14   Q.  You said you and your partner were doing patrol duties;

15   right?

16   A.  Well, it wasn't patrol duties in a marked patrol car.

17   Q.  So you testified that you were on patrol duties.  Were you

18   on patrol duties or were you not on patrol duties?

19   A.  I was assigned to the narcotics division, as I still am

20   today, and we were in an unmarked vehicle doing patrol duties.

21   We were doing things that patrol would do, but we were in an

22   unmarked vehicle.

23   Q.  Okay.  And you come across Patrick Daniels, you recognize

24   the truck because you have had a previous encounter with him;

25   correct?

CROSS - BELL

1    A.  Actually, I didn't recognize the truck because at this

2    particular time he had different after-market wheels on the

3    vehicle, so no, I didn't know the truck was actually Mr.

4    Daniels'.

5    Q.  But you saw from the pictures you took that those wheels

6    were in the back of the truck; correct?

7    A.  Right.

8    Q.  And you conduct a traffic stop; is that right?

9    A.  That's correct.

10   Q.  Now, you are a task force agent assigned to the DEA;

11   right?

12   A.  Yes, sir.

13   Q.  Your parent law enforcement agency is Hancock County?

14   A.  That's correct, yes, sir.

15   Q.  I think you testified that you started there shortly

16   before May 8th or 9th; is that correct?

17   A.  No, sir, I started there March 7th, I am sorry.

18   Q.  I'm sorry, March.  Prior to that, you were with Long Beach

19   Police Department?

20   A.  Yes, sir, that's correct.

21   Q.  And when you were with Long Beach department, were you

22   assigned as a task force officer with DEA?

23   A.  I was, yes, sir.

24   Q.  And now that you switched parent organizations, you're

25   learning the ropes then; right?

1    A.   Learning the roads.  The laws and that nature of things,

2    that doesn't really change from agency to agency.  But my

3    biggest issue was I didn't know where I was at in Hancock

4    County physically, the roadways.

5    Q.   So you and your partner are conducting these patrol duties

6    in an unmarked vehicle?

7    A.   Correct.

8    Q.   And can you describe for the jury what vehicle, what your

9    vehicle looks like?

10   A.   Yes, it's a 2021 Chevy 1500 Silverado, has a silver

11   toolbox on the back.  Depending on how you look at it, it could

12   be brown from one angle, it could be black from the other.

13   Q.   And do you have police lights and sirens and the items or

14   tools associated with law enforcement?

15   A.   Yes, I do.  All of that is affixed to the vehicle.

16   Q.   And by looking at your vehicle, can you tell that you're

17   law enforcement?

18   A.   No, sir.

19   Q.   And do you have what's commonly referred to as a dash-cam

20   to record traffic stops such as this one?

21   A.   No, sir, I do not.

22   Q.   Is it a policy of Hancock County or the DEA to have these

23   types of recording devices so that we can see exactly what was

24   happening at the time of the stop?

25   A.   Not for narcotics, no, sir.

CROSS - BELL

1    Q.  And when you approach Mr. Daniels, were you wearing any

2    kind of equipment to record your interaction with Mr. Daniels

3    so that we could see exactly what was said or done?

4    A.  No, sir, I was not.

5    Q.  And that's because there's a policy that doesn't require

6    you to have these types of tools or items to gather evidence

7    and collect evidence during a traffic stop?

8    A.  That is correct, nor is it issued.

9    Q.  Excuse me?

10   A.  It's not issued, either.

11   Q.  Now, you said when you saw the vehicle, you stopped the

12   vehicle, you approached the vehicle and you smelled the odor of

13   marijuana; is that correct?

14   A.  That's correct, yes, sir.

15   Q.  Is it your testimony that Mr. Daniels was actively engaged

16   in smoking marijuana?

17   A.  No, sir.  I can tell you that I just smelled marijuana

18   almost immediately upon contact.

19   Q.  And subsequent to a search of the vehicle, you found what

20   you describe as blunts; is that correct?

21   A.  Yes, sir.

22   Q.  Can you tell the jury what a blunt is?

23   A.  A blunt, or a marijuana cigarette, would be something that

24   is started out as a usual size, I don't know, four- or

25   five-inch cigarette that is either rolled up with marijuana or

1   a blunt wrapper that's rolled up with marijuana, and once the

2   subject uses the marijuana, it's the burnt end.

3   Q.   And you collected the burnt end of those blunts, then;

4   correct?

5   A.   Yes, sir, that's correct.

6   Q.   And that's one of the exhibits in front of you?

7   A.   Yes, sir, that's correct.

8   Q.   And those blunts were found in an ashtray?

9   A.   Yes, sir, that's correct.

10          **MR. WEBER:**  Government's Exhibits 1, 2, 10 and 11,

11   the pictures.

12          **THE COURT:**  I believe all of the photographs -- those

13   photographs?  She didn't put them back?  All right.

14   **BY MR. WEBER:**

15   Q.   I am showing you Government Exhibit 1.  And what you

16   testified to is that after you gathered the firearms and the

17   marijuana, you collected them and took this picture,

18   Government's Exhibit 1?

19   A.   That's correct, yes, sir.

20   Q.   And this is not how these items were situated in the

21   vehicle?

22   A.   No, sir.

23   Q.   Government Exhibit 2 appears to be a closer image of

24   focusing in on what you describe as the blunts; is that

25   correct?

1    A.   That's correct, yes, sir.

2    Q.   And Mr. Daniels said that he was living out of back of his

3    car, or truck?

4    A.   Yes, sir.

5    Q.   And so we have evidence that that's -- some truth to that.

6    We see, what, a pillow and a blanket; is that right?

7    A.   Yes, sir.

8    Q.   He told you that the AR-15 belonged to someone else?

9    A.   Yes, sir.

10   Q.   You did something called an eTrace report?

11   A.   Correct.

12   Q.   And the eTrace tells us when that firearm was purchased

13   until the time that it was acquired or seized by you, then;

14   correct?

15   A.   Yes, sir.

16   Q.   Do you recall looking at the eTrace report of that

17   particular firearm, the AR-15, who purchased that firearm?

18   A.   I do not, not without looking at the eTrace report.  I'm

19   sorry, I don't recall that name.

20   Q.   Do you have that eTrace report?

21   A.   It's in my reports, but I don't have it with me.

22   Q.   We'll get back to that.  The bottom line is, is Patrick

23   Daniels wasn't the purchaser of that firearm?

24   A.   I can't recall.  I can't recall the names that was on

25   eTrace.

1           **MR. WEBER:**  Your Honor, may we take a break or try to

2      find this report?

3           **THE COURT:**  I'll let you take it up -- do you have

4      his report available?

5           **MS. ROSE:**  I don't believe we have the eTrace here in

6      court, Your Honor.

7           **THE COURT:**  Was that provided to counsel opposite

8      during discovery?

9           **MR. WEBER:**  No, it wasn't.

10          **THE COURT:**  It was not?  Let's get back to that later

11     on.  Let's go ahead and proceed with your cross-examination.

12     He says he doesn't know.  He says he doesn't know for sure, but

13     it may be in his report.

14     **BY MR. WEBER:**

15     Q.  You also did an eTrace report on the 9-millimeter pistol?

16     A.  That's correct, yes, sir.

17     Q.  And who was the original purchaser of that particular

18     firearm?

19     A.  I don't recall, sir.

20     Q.  And you don't know whether or not it was Patrick Daniels?

21     A.  No, sir.

22     Q.  You don't know who it was?

23     A.  No, sir.

24     Q.  In preparing for your testimony today, did you review

25     these eTrace reports?

CROSS - BELL

1    A.  I did not, no, sir.

2    Q.  You testified that, and we heard on the recording that

3    there was a previous interaction between you and Mr. Daniels

4    approximately on March 9th at a Circle K?

5    A.  Yes, sir.

6    Q.  And you testified that there were firearms and marijuana?

7    A.  Correct, yes, sir.

8    Q.  And did you charge Mr. Daniels with possession of those

9    firearms?

10   A.  I did not, no, sir.

11   Q.  Did anyone charge Mr. Daniels with possession of those

12   firearms back on April the 25th?

13   A.  I believe Mr. Daniels was only charged with an outstanding

14   warrant on that date.

15   Q.  So despite the fact that you found him in possession of

16   firearms and marijuana, you didn't charge him with those

17   offenses?

18   A.  No, sir, I did not.

19          **MR. WEBER:**  Court's indulgence.

20   **BY MR. WEBER:**

21   Q.  Going back to this encounter on March 9th at Circle K, did

22   you do a report on that encounter?

23   A.  I did not.  And the reason I did not is because I didn't

24   have access to Hancock County's database.  I was two days in

25   and did not have access to anything, so I was just attempting

1    to do what I could to justify my time, which is learn the

2    roadways and participate in details with the other officers.

3     Q.   Officer Bell, you understand that what reports -- the

4    purpose of reports is to help us remember what happened and

5    give us details about what went down or the interaction between

6    you and someone like Mr. Daniels; right?

7     A.   That's correct, but I wasn't the lead agent on that,

8    either.

9     Q.   Have you seen any reports regarding the stop or the

10   encounter on March 9th of 2022?

11    A.   No, sir, I have not.

12             **MR. WEBER:**  No further questions.

13             **THE COURT:**  Any redirect examination, Ms. Rose?

14             **MS. ROSE:**  No, Your Honor.  Thank you.

15             **THE COURT:**  Thank you, sir, you may step down.

16             **WITNESS:**  Thank you, Your Honor.

17             **THE COURT:**  Who is your next witness?

18             **MR. BUCKNER:**  ATF Agent Shane Lynes.  Your Honor, may

19   I move the exhibits back to the exhibit table?

20             **THE COURT:**  Insist.  Thank you, Mr. Buckner.

21             **MR. BUCKNER:**  Thank you, your Honor.

22             **THE COURT:**  Would you raise your right hand and be

23   sworn, please.

24        (Oath Administered)

25                              **SHANE LYNES,**

1    **having first been duly sworn, testified as follows:**

2                              **DIRECT EXAMINATION**

3    **BY MR. BUCKNER:**

4    Q.  Can you please introduce yourself and spell your last name

5    for the record?

6    A.  My name is Shane Lynes, L-Y-N-E-S, and I am a federal

7    agent for the Bureau of Alcohol, Tobacco, Firearms &

8    Explosives, commonly known as the ATF.

9    Q.  How long have you worked as an ATF agent?

10            **MR. WEBER:**  Your Honor, we would accept Special Agent

11   Lynes as an expert in the identification of firearms.

12            **THE COURT:**  Thank you.  You may proceed.

13   **BY MR. BUCKNER:**

14   Q.  How long have you worked as a special agent with the ATF?

15   A.  I have been with ATF since 2007.  Prior to that, I started

16   my law enforcement career in 2001, and then prior to that I was

17   in the Air Force.

18   Q.  And you have heard the defense acknowledge that they're

19   going to accept your expert qualifications.  But briefly, have

20   you received any special training for determining where guns

21   are manufactured and whether or not they qualify as firearms?

22   A.  Yes, I have.

23   Q.  Tell the ladies and gentlemen of the jury a little bit

24   about that.

25   A.  The regular training or the advanced training?

1    Q.   The training specifically related to interstate nexus?

2    A.   So after I was an agent for a few years, I went to the

3    Firearms Technology Branch up in West Virginia where they have

4    an assortment of over 10,000 firearms.   There, I examined

5    thousands of firearms and I learned to use a systematic

6    scientific method where I would look at the firearm, write down

7    the observations on it, form a hypothesis, and then through my

8    personal, knowledge, experience, training, education, and the

9    research I conducted on that, I would test that hypothesis.

10   Q.   And that training that you received, those techniques that

11   you learned, did you apply those to what you did in this case?

12   A.   I did.

13   Q.   And specifically, did you have the opportunity to examine

14   two firearms related to this case?

15   A.   I did, and I also test fired them.

16   Q.   And did you generate a report after you conducted your

17   initial examination?

18   A.   So I was first contacted in May of 2020, or 2022 on this

19   case.   I examined them, the markings off of the photos.   And

20   then last week I actually physically examined the firearms, to

21   include function test them.

22   Q.   And so you did an initial examination of photographs and

23   then physically examined the firearms after that?

24   A.   That is correct.

25         MR. BUCKNER:   Your Honor, may I approach the table?

1              THE COURT:  You may.

2    BY MR. BUCKNER:

3    Q.  I have handed you what's been admitted as G-27.  Is that

4    the initial report that you prepared after your viewing of the

5    photographs?

6    A.  Yes, sir.

7    Q.  And were you able to determine, based on reviewing the

8    photographs, where you believed those firearms to be

9    manufactured?

10   A.  That is correct.

11   Q.  And that's reflected in your report?

12   A.  Absolutely.

13             MR. BUCKNER:  May I approach again, Your Honor?

14             THE COURT:  Yeah.  You don't have to ask me again.

15   If you need to come forward, do so.

16             MR. BUCKNER:  Thank you, Your Honor.

17             THE COURT:  Sure.

18   BY MR. BUCKNER:

19   Q.  Agent Lynes, I have handed you what's been marked as G-25.

20   Can you make sure that's safe?

21   A.  I already have, yes, sir.

22   Q.  You're good?

23   A.  Yes, sir.

24   Q.  And in addition to G-25, there's G-25A and G25B.  Do you

25   see those?

DIRECT - LYNES

1    A.  Yes, sir, I do.  I am not familiar with G-25B, the

2    ammunition.

3    Q.  Okay.  But G-25A, can you tell the ladies and gentlemen of

4    the jury what that is?

5    A.  G-25A is a magazine capable -- that I was told that was

6    with this firearm, and it's considered high-capacity magazine.

7    Q.  And let's go back to G-25A. -- I mean G-25, I apologize,

8    the firearm itself.

9    A.  Yes, sir, I have it.

10   Q.  So when you examined G-25, did you examine that and

11   conduct research into that firearm?

12   A.  I did.

13   Q.  And based upon your examination and research, do you have

14   an opinion as to whether this gun qualifies as a firearm under

15   federal law?

16   A.  It does qualify as a firearm.  I also test fired it last

17   week and it did function as designed.

18   Q.  And, also, were you able to determine where that firearm

19   was manufactured?

20   A.  Yes, I did through -- so part of what I do is called

21   interstate commerce, and what interstate commerce is, is from

22   one place in one state to another place in another state, but

23   not within the same state.  So for instance, if I was in, say,

24   Mississippi and traveled to Louisiana and crossed the state

25   line going into another state, that's effecting interstate

1    commerce.  So they also have a thing called foreign commerce,

2    which is -- which is like within the United States or its

3    territories to another country that's not controlled or

4    operated by the United States.  So that's interstate and

5    foreign commerce.

6    Q.   So when you examined G-25, based on your examination and

7    research, what was your opinion as to where that firearm was

8    manufactured?

9    A.   It was not manufactured in the State of Mississippi.

10   Q.   Now, are there markings on that firearm that would appear

11   to imply where it was made?

12   A.   It would appear so.  Part of what I do, I have a library

13   in my office of reference material, but we also have what's

14   called ATF literature, which is a marking variance.  So the

15   best way to explain what a marking variance is, say that I own

16   the rights to a firearm, I am an engineer, I designed it, this

17   is what I want, but I don't have the materials or the machine

18   shop to actually make it, but I know a friend that does, say,

19   in Alabama.  So I can apply to the ATF, the Firearms Industry

20   Program Branch, and ask for a marking variance.  So after 1968,

21   the Gun Control Act, it required manufacturers to actually put

22   where it was made, the importer's information, and use a unique

23   serial number that could not be duplicated.  So in this

24   particular case with a marking variance, I can put my

25   information on there saying it was made right here in Gulfport,

1   Mississippi, but it was really made in Alabama by my friend if

2   that's approved by ATF.

3   Q.  So that specific firearm, the markings on that, where

4   would it appear that it was manufactured?

5   A.  By American Tactical in Summerville, South Carolina.

6   Q.  Now, based on your research and your examination of that

7   firearm, where was that gun actually made?

8   A.  In Indiana by BCI Defense.

9   Q.  And did the manufacturer of that firearm obtain a variance

10  in order to put that South Carolina information on the gun when

11  it was actually manufactured in Indiana?

12  A.  Yes, sir, they did.

13  Q.  But regardless, that gun wasn't made in Mississippi, was

14  it?

15  A.  No.

16  Q.  So if that firearm was recovered in Mississippi, do you

17  have an opinion as to whether it would have had to travel in

18  interstate commerce in order to be here?

19  A.  It would've had to -- to be possessed in Mississippi, it

20  would've had to effect interstate commerce to be here today.

21  Q.  You also examined a handgun; is that correct?

22  A.  That is correct, it's a Springfield.

23  Q.  And were you able to determine where that firearm was

24  manufactured as well?

25  A.  Yes.  That's actually manufactured in Croatia and then

1   imported through Springfield Armory.  So earlier when I was

2   talking about foreign commerce, Croatia is actually part of

3   Europe, not part of the United States, so it would've had to

4   effect foreign commerce to be inside the United States.

5   Springfield Armory has been importing guns from Croatia since

6   about 2003, and so that was imported there, assembled, finished

7   assembly, and then shipped from Springfield, Illinois.

8   Q.  I have handed you what's been marked G-26.  Is that the

9   Springfield Armory Hellcat 9-millimeter that you examined?

10  A.  Trying to look at the serial number through the bag.  That

11  is correct, yes, sir.

12  Q.  And did you also test fire that weapon?

13  A.  I did, and it functioned as designed.

14  Q.  So for that gun to have been recovered in Mississippi, do

15  you have an opinion as to whether or not it would've had to

16  travel in interstate or foreign commerce?

17  A.  Both.

18  Q.  It would've had to do both?

19  A.  Yes, sir.

20       **MR. BUCKNER:**  May I have the Court's indulgence for

21  one moment, Your Honor?

22       If I may have use of the Elmo, Your Honor.

23       **THE COURT:**  Sure.

24  BY MR. BUCKNER:

25  Q.  Looking here, this is Government's Exhibit G-27.  I

 1  believe you have a copy in front of you.  That's the report you

 2  prepared from the photographs of the firearms; is that correct?

 3  A.  Yes, sir.  And on Exhibit 1, when I say it was

 4  manufactured by HS Product, it's spelled with a K, that's

 5  actually the correct spelling on how Croatia spells it.

 6  Q.  Exhibit one, that's the handgun; is that correct?

 7  A.  Correct, the Springfield Armory.  That's one of their R

 8  series.  It came out in 2019.  They actually make like a

 9  Hellcat, a Bobcat, and a Firecat.  It's out of their R series.

10  Q.  And Exhibit 2 is the rifle?

11  A.  That is correct.

12          **MR. BUCKNER:**  Tender the witness, Your Honor.

13          **THE COURT:**  Cross-examination?

14                   **CROSS-EXAMINATION**

15  **BY MR. WEBER:**

16  Q.  Special Agent Lynes, you are a recognized expert in

17  firearm identification and interstate commerce?

18  A.  Yes, sir, that is correct.  I also teach it.

19  Q.  Right.  And you are also a special agent with the ATF?

20  A.  That is correct, a criminal investigator.

21  Q.  ATF is Alcohol, Tobacco, Firearms & Explosives, ATFE,

22  then; right?

23  A.  Correct, it's usually referred to on official documents,

24  BATFE, which stands for the Bureau of Alcohol, Tobacco,

25  Firearms & Explosives.

1    Q.   What's the focus or the mission of the ATF?

2    A.   Firearms, violent crime.

3    Q.   And other than what you have just testified to as far as

4    whether or not these are considered firearms, whether or not

5    these exhibits are considered firearms, and whether or not they

6    traveled in interstate commerce, were you asked to do anything

7    else in this case concerning those two exhibits?

8    A.   Besides the interstate nexus and test fire them, no.

9              **MR. WEBER:**  No further questions.

10             **THE COURT:**  Any redirect examination?

11             **MR. BUCKNER:**  No, Your Honor.

12             **THE COURT:**  You may be excused.

13        Who is your next witness?

14             **MS. ROSE:**  Your Honor, the government would call

15   Stephanie Armas, who is a chemist with the DEA lab.

16        (Oath Administered)

17             **THE COURT:**  You may proceed.

18             **MS. ROSE:**  Thank you, Your Honor.

19                         **STEPHANIE ARMAS,**

20   **having first been duly sworn, testified as follows:**

21                       **DIRECT EXAMINATION**

22   **BY MS. ROSE:**

23   Q.   Good afternoon.

24   A.   Good afternoon.

25   Q.   Could you please state your name and spell your last name

1    for the record?

2    A.  My name is Stephanie Armas, last name A-R-M-A-S.

3    Q.  Thank you, Ms. Armas.  And what is your occupation?

4    A.  I am a forensic chemist for the Drug Enforcement

5    Administration, short for DEA.

6    Q.  And how long have you worked in that field?

7    A.  I have worked for the DEA since 2020.

8    Q.  And what is your educational background?

9    A.  I have two bachelor's degrees, one in forensic science and

10   another one in chemistry from the University of Central

11   Florida, as well as a master's degree in chemistry, also from

12   the University of Central Florida.

13   Q.  Do you possess any certificates or licenses?

14   A.  I do not.

15           MS. TYNES:  Your Honor, the defendant will stipulate

16   that she's an expert in the field of, I believe, forensic

17   chemistry.

18           THE COURT:  Thank you, Ms. Tynes.  You may proceed.

19           MS. ROSE:  Thank you, Your Honor.

20   BY MS. ROSE:

21   Q.  In your current job, what things do you do on a day-to-day

22   basis?

23   A.  So my day-to-day job consists of analyzing various cases

24   from different agencies, such as FBI, DEA, ATF, that deals with

25   the analysis of the presence or absence of controlled

1    substances.  And I write a report on those findings and testify

2    when called upon to do so.

3                  **MS. ROSE:**  Your Honor, may I approach the table?

4                  **THE COURT:**  Sure.

5    **BY MS. ROSE:**

6    Q.  And were you working in that capacity on July 20th of this

7    year?

8    A.  Yes, ma'am.

9                  **MS. ROSE:**  May I approach the witness, Your Honor?

10                 **THE COURT:**  Sorry, I did not hear you.

11                 **MS. ROSE:**  May I approach the witness?

12                 **THE COURT:**  Yes.  And you don't have to ask me.  If

13   you need to, just go ahead and do it.

14                 **MS. ROSE:**  Thank you, Your Honor.

15   **BY MS. ROSE:**

16   Q.  I'm going to show you what's been marked as G-29, as well

17   as G-28.

18   A.  May I?  Thank you, Your Honor.

19   Q.  Looking at G-29, what is that?

20   A.  Looking at G-29, this is the chemical analysis report that

21   I wrote up based on my findings.

22   Q.  How do you prepare that report?

23   A.  Well, when the evidence gets submitted and I pick it up, I

24   go through my analysis, protocol, I take a gross weight, which

25   is the weight of the entire packaging; a net weight, which is

1   just the weight of the substance that I am going to analyze.

2   And I perform, in this case, three analyses, microscopic --

3   microscopic examination, a color test 4-AP, and gas

4   chromatography/mass spectrometry, short for GCMS.  I close up

5   and write what the -- what I report on those findings.

6   Q.  Do you recognize G-28?

7   A.  Yes, ma'am.

8   Q.  What is that?

9   A.  So, this is the exhibit that was submitted to the

10  laboratory and the exhibit which I analyzed.  And I can

11  recognize it based on my seal that's at the bottom, and the

12  lens number which is the unique identifier.

13  Q.  So you performed your analysis on the items in that bag?

14  A.  Yes, ma'am.

15  Q.  And what conclusion did you come to upon completing your

16  analysis?

17  A.  I concluded the presence of marijuana.

18  Q.  Your Honor, may I publish G-29?

19          **THE COURT:**  Sure.

20  **BY MS. ROSE:**

21  Q.  So looking at this here, just to help the jurors

22  understand your report, so Exhibit 1, what is that referring

23  to?

24  A.  Exhibit 1 is referring to the exhibit that was submitted.

25  Q.  Okay.  And it says "substance is identified as marijuana"?

1   A.  Yes, ma'am.

2   Q.  And what does the weight mean?

3   A.  The net weight where it says .446 grams, plus or minus

4   .002 grams, is the weight of just the substance.  So what was

5   submitted was multiple cigarette butts.  I described the

6   packaging as cigarette or cigars, and it contained plant

7   material.  The net weight, what it's called, is just the weight

8   of that plant material.

9   Q.  What is the reserve weight, what does that mean?

10  A.  The reserve weight just indicates whatever weight was left

11  upon completion of my analysis.

12  Q.  And at the bottom where it talks about your analysis,

13  those are the tests that you described earlier?

14  A.  I am sorry, can you -- do you refer to the summary of

15  tests?

16  Q.  Yes.

17  A.  Yes, ma'am, those are the tests that I performed.

18  Q.  And in your conclusion, was what was found in these

19  cigarette butts was marijuana?

20  A.  That is correct.

21          **MS. ROSE:**  May I have just a moment, Your Honor?

22  **BY MS. ROSE:**

23  Q.  And do you offer all of your testimony today to a

24  reasonable degree of scientific certainty?

25  A.  Yes, ma'am.

1          **MS. ROSE:**  I have no further questions, Your Honor.

2          **THE COURT:**  Cross-examination, Ms. Tynes?

3          **MS. TYNES:**  Thank you, Your Honor.

4     May I proceed?

5          **THE COURT:**  Yes, you may.

6                    **CROSS-EXAMINATION**

7   BY MS. TYNES:

8   Q.  Good afternoon.

9   A.  Good afternoon.

10  Q.  Ms. Armas, you don't actually participate in the actual

11  investigation of the case; is that correct?

12  A.  I do not.

13  Q.  So you're not present at the -- when the evidence is

14  collected; is that correct?

15  A.  I do not.

16  Q.  You just analyze the materials at the lab?

17  A.  Yes, ma'am.

18  Q.  So as far as this case, you don't have any direct

19  knowledge about the specific facts regarding the case; is that

20  correct?

21  A.  That is correct.

22  Q.  Okay.  And again, you did not collect the sample involved;

23  is that correct?

24  A.  That is correct.

25  Q.  And the samples, it's collected, generally, by law

1   enforcement?

2   A.   I would assume so.

3   Q.   You would assume so, okay.   Somehow it's collected, it's

4   put in a bag; is that correct?

5   A.   Yes, ma'am.

6   Q.   And the bag is sealed, generally speaking?

7   A.   Yes, ma'am.

8   Q.   And then how does it -- it gets to your lab.   Do they mail

9   it to the lab?

10   A.   I believe in this case the task force officer hand

11   delivered it.

12   Q.   To Miami?

13   A.   I believe so.

14   Q.   Would that be noted on your chain of custody?

15   A.   That will be noted on the DEA 7.

16   Q.   And do you have a copy of that with you?

17   A.   I do.

18   Q.   Can you have a look?

19   A.   Yes, ma'am.

20   Q.   Thank you.

21   A.   So, in fact, it was received from Ray W. Bell.

22   Q.   Directly to the lab in Miami?

23   A.   Yes, ma'am.

24   Q.   Okay.   And the date of that would've been on May 3 of

25   2022; is that correct?

1    A.   Yes, ma'am.

2    Q.   And I believe it was logged in by Clarissa, I am not going

3    to attempt to pronounce her last name?

4    A.   Clarissa M. Karasalis (phonetic).

5    Q.   And that's somebody who works at the lab; is that correct?

6    A.   That's correct.

7    Q.   Generally speaking, when it's logged in the lab, it's

8    going to be signed somewhere on the packaging, is that correct,

9    or at least on the form, the chain of custody form; is that

10   correct?

11   A.   So when evidence comes to our laboratory, it goes through

12   a laboratory information management system.   So everything gets

13   logged into the management system and it can be tracked.

14   Q.   Okay.   And that was done in this case; is that correct?

15   A.   Correct.

16   Q.   And the material that we're talking about in this case,

17   it's marijuana blunts; is that correct?

18   A.   Yes.

19   Q.   So like small little bitty burnt ends of what appears to

20   be cigarettes; is that correct?

21   A.   Yes, ma'am.

22   Q.   Something you would typically find in an ashtray; is that

23   correct?

24   A.   I cannot testify as to where it was found.

25   Q.   And in this particular case, it was analyzed, I believe,

1    last week; is that correct?

2    A.  Yes, ma'am, I believe so.

3    Q.  And then you provided the report that you produced; is

4    that correct?

5    A.  Yes, ma'am.

6    Q.  Now, marijuana is a plant material; is that correct?

7    A.  Yes, ma'am.

8    Q.  And because it's a plant material, it also contains other

9    substances other than THC; is that correct?

10   A.  As a plant, marijuana contains other cannabinoids that are

11   inherent to the plant.

12   Q.  And some of those things, for example, would be like CBD;

13   is that correct?

14   A.  Yes, ma'am.

15   Q.  And CBC; is that correct?

16   A.  It could contain that.  I don't believe I noted that in my

17   findings.

18   Q.  Okay.  Or is it THCA, that's another substance found in

19   marijuana; is that correct?

20   A.  It could be found in marijuana.

21   Q.  And these are all naturally occurring substances because

22   it's plant material; is that correct?

23   A.  Yes, ma'am.

24   Q.  And when you test it, and you use the -- in this

25   particular case, I believe the gas chromatography/mass

CROSS - ARMAS

1  spectrometry test, is that correct, is that what you used in

2  this case?

3   A.  One of the tests.

4   Q.  One of the tests.  So there were several tests, one is the

5  AP color test; is that correct?

6   A.  Yes, ma'am.

7   Q.  And that's basically you put something on it and it turns

8  a particular color if there's marijuana in there; is that

9  correct?

10   A.  The way that the color test is performed, there's two

11  agents or two solvents, if you may.  Once those solvents

12  interact with the substance in the plant material, if it turns

13  blue it indicates that the content of THC is greater than the

14  possible content of the CBD.

15   Q.  When you do the gas chromatography/mass spectrometry test,

16  it will show if there's other substances involved as well; is

17  that correct?

18   A.  Yes.

19   Q.  And generally speaking, it prints out kind of a test

20  result where there's, I think, best described as peaks?

21   A.  Yes, ma'am.

22   Q.  In this case there was some indication that there was

23  other substances involved in the sample; is that correct?

24   A.  Yes, ma'am.

25   Q.  I believe it looked like maybe six other substances?

1    A.   I do not recall.  I would have to refresh my memory by

2    looking at the results.

3    Q.   But at least more than THC?

4    A.   Yes, ma'am.

5    Q.   And that is not noted on the report that you provided; is

6    that correct?

7    A.   The report contains a statement that is called OP

8    (phonetic) checked, I believe, where I mention that the THC to

9    internal standard ratio is greater than one.  And I looked at

10   the other peaks, but they were not peaks of interest.

11   Q.   In this case, I believe you said the net weight was

12   .446 grams; is that correct?

13   A.   That is correct.

14   Q.   Would that include the other substances as well?

15   A.   Yes, ma'am.

16   Q.   Yes, okay.  So in this particular case, the actual amount

17   of the controlled substance could be less than .446 grams; is

18   that correct?

19   A.   A quantitation was not performed.

20   Q.   So you can't answer that question; is that correct?

21   A.   I cannot.

22   Q.   And just for reference, a general, like a sugar packet

23   that you can get at a restaurant or something like that,

24   generally speaking has about 3.5 grams of sugar, do you know?

25   A.   I do not know.

1    Q.   Would you disagree -- does that sound accurate as a

2    forensic chemist?

3    A.   I cannot testify to something I do not know.

4    Q.   But this would be .446 grams is substantially less than

5    that, less than 3.5 grams; is that correct?

6    A.   .446 is less than 3.5 grams, that is correct.

7              **MS. TYNES:**  I tender the witness.

8              **THE COURT:**  Any redirect examination for this

9    witness?

10             **MS. ROSE:**  No, Your Honor.

11             **THE COURT:**  Thank you very much.  Madam, you may be

12   excused.

13             **WITNESS:**  Thank you, Your Honor.

14             **THE COURT:**  Who is your next witness?

15             **MS. ROSE:**  The government does not have any

16   additional witnesses, Your Honor.

17             **THE COURT:**  I am really sorry, Ms. Rose, but you talk

18   really fast.  I don't hear at the same speed that you talk.

19   What did you just say?

20             **MS. ROSE:**  We do not have any additional witnesses,

21   Your Honor.

22             **THE COURT:**  Does that mean the government rests?

23             **MS. ROSE:**  That is correct, Your Honor.

24             **THE COURT:**  That is the proper terminology, and I

25   thank you.  Ladies and gentlemen of the jury, the government

1  has rested, which means that they have produced all of the

2  evidence they intend for you to hear.  I will need to take up

3  some matters with the lawyers outside of your presence before

4  we can proceed.  Please go back to the jury room.

5          **(JURY OUT AT 4:24 P.M.)**

6          **MR. BUCKNER:**  Your Honor, may I return the exhibits

7  to the table?

8          **THE COURT:**  Yes, please.  Thank you.

9      Ms. Tynes, Mr. Weber, the government has rested.  Any

10  motions?

11          **MR. WEBER:**  Yes, Your Honor.

12      Your Honor, the defendant at this time, pursuant to Rule

13  29 of the Rules of Criminal Procedure, moves the Court for a

14  judgment of acquittal.  Looking at the evidence presented by

15  the government in the light most favorable to the government,

16  they have failed to prove beyond a reasonable doubt the

17  elements of the offense.  Specifically, whether -- they failed

18  to prove that Patrick Daniels knew he was an unlawful user and

19  that he was a member of this group that was prohibited from

20  possessing a firearm.

21      I also renew my motion to dismiss for vagueness on its

22  face and as applied.  Going back to something that the Court

23  said in giving the preliminary instructions, the Court noted

24  that a user, as that term is defined by the Court, I believe

25  the Court said recent use or active use, there's no evidence

1    presented by the government of recent use or active use.  The

2    evidence was on the occasion of the stop, which was April 25th,

3    he was found in possession of firearms and he was found in

4    possession of partially burnt, what was referred to as blunts.

5    There's no evidence that he was actively using this marijuana

6    at the time of the stop.

7             THE COURT:  What about his statement, that he uses

8    marijuana 14 times a month from high school?

9             MR. WEBER:  Your Honor, I understand that statement

10   was made, Your Honor, but there's no timeframe in which to put

11   that statement in.  There's no, for example, urinalysis, hair

12   sample testing that has been presented to the jury to show that

13   the substance is even in his system.  There was testimony that

14   six weeks prior, approximately on March the 9th, he was found

15   in possession of marijuana.  But again, there's no indication

16   that at that point he was notified that this -- written a

17   ticket or arrested for this particular charge.

18            THE COURT:  Let me put it to you this way:  If you

19   admit that you use marijuana and that you use it frequently,

20   and at the time of your arrest you're found in possession of

21   the remnants of marijuana cigarettes, could not the jury infer

22   from those facts that you are a user?

23            MR. WEBER:  Your Honor, that kind of --

24            THE COURT:  Wouldn't that be a question of fact for

25   the jury to resolve?

1              **MR. WEBER:**  Well, that's something that occurred in

2   the case out of Utah, the *Morales-Lopez*.  When the district

3   judge -- the evidence in that case was that the defendant was

4   found in possession of methamphetamine, and then admitted some

5   five weeks prior to using methamphetamine.  But what the Court

6   found is that, and I'll read from the case, that Mr. Morales

7   admitted to using methamphetamine and marijuana in late

8   November or early December of 2019.  On January 10th of 2020,

9   the same day he was arrested, he possessed methamphetamine.

10  Although the government argued that Mr. Morales' possession of

11  methamphetamine is indicative of use, the government presents

12  no evidence that Mr. Morales actually used drugs at any point

13  in the five weeks leading up to his arrest.  So we don't

14  have --

15             **THE COURT:**  I suppose Mr. Morales didn't confess to

16  it?

17             **MR. WEBER:**  That's true.  We do have a statement, and

18  I am not sure what the government can attach, as far as

19  evidence, to that statement, perhaps the burnt marijuana in the

20  glove compartment, but there's no evidence when that substance

21  was used or not used.

22             **THE COURT:**  Again, would that not be a question of

23  fact for the jury to determine?

24             **MR. WEBER:**  Perhaps.

25             **THE COURT:**  All right.  Here is what I am going to

1    do.  I am going to consider your motion as two motions, one

2    which is the judgment of acquittal on the question of whether

3    the government has proven that he is a user beyond a reasonable

4    doubt.  And then I am going to bifurcate that, if you will,

5    into the second motion for judgment of acquittal, which has to

6    do with the facial attack on the constitutionality of the

7    statute itself.  I think I want to keep those things separate.

8            **MR. WEBER:**  Yes, Your Honor.  But I do want the

9    record to be clear that based on the facts presented by the

10   government today, I believe there is now an as-applied attack

11   to 922(g)(3) to the facts as presented by the government.

12           **THE COURT:**  All right.  Does the government wish to

13   respond?

14           **MS. ROSE:**  Yes, Your Honor.  With respect to the

15   defendant's Rule 29 motion, especially considered in the light

16   most favorable to the government, there has been evidence

17   presented today that the defendant was actively using at this

18   time.  First and foremost, you heard the testimony of Officer

19   Bell who said he smelled marijuana upon approaching the

20   vehicle, and that was the reason he did the search of the car.

21           Additionally, we have the defendant's statements that he

22   was a user, that he used 14 days a month.  April is a

23   30-day-a-month month, so therefore he was probably using it

24   every other day that month.

25           Additionally, he talks about the incident at Circle K

1    where he was using at that time.  He talked about how he has

2    been using since he graduated from high school.  He is 26 years

3    old.  So he as been a regular user for eight years.  The

4    government would argue that there's sufficient evidence to say

5    that Mr. Daniels is an unlawful user and that the jury can make

6    that inference based on what they have heard.

7          With respect to the other argument, the government would

8    rest on its motion.  Thank you.

9                THE COURT:  Anything else, Mr. Weber?

10               MR. WEBER:  No, Your Honor.

11               THE COURT:  All right.  I am going to do it this way.

12   On your motion for judgment of acquittal based upon the failure

13   of the government to prove the essential element of user beyond

14   a reasonable doubt, I must take the evidence which is offered

15   by the government in the light most favorable to the

16   government, and granting to that evidence all the more

17   reasonable inferences that may be drawn from that evidence, and

18   under those circumstances your motion should be denied.

19         Your motion with regard to the as-applied, or facial

20   constitutional challenge to the statute itself, I am going to

21   take that matter under advisement.  And I am going to submit

22   the matter to the jury at some point and come back later with a

23   ruling on the constitutionality, if you will, the motion that

24   you have made, I am going to call it the second motion, which

25   challenges the vagueness of this particular statute.  Is that

1   clear?

2            **MR. WEBER:**   Yes, Your Honor.   Thank you.

3            **THE COURT:**   So your second motion, which has to do

4   with the constitutionality aspect of the statute is reserved

5   pursuant to Rule 29(b).   I do intend to submit the matter for

6   the jury's resolution and ultimate reaching of a verdict, and

7   then I will consider the motion after the verdict.

8        With regard to your first motion, the one that has to do

9   with the government's failure to prove beyond a reasonable

10  doubt all the essential elements, that is denied.

11       Anything else?

12           **MR. WEBER:**   No, Your Honor.

13           **THE COURT:**   Then I have a question.   Are you ready to

14  proceed?

15           **MR. WEBER:**   Yes, Your Honor.

16           **THE COURT:**   Does the defendant intend to call any

17  witnesses?

18           **MR. WEBER:**   No, Your Honor.

19           **THE COURT:**   Does the defendant intend to testify?

20           **MR. WEBER:**   No, Your Honor.

21           **THE COURT:**   Then let me take up this matter, then.   I

22  am going to do it this way.

23       Mr. Daniels, your attorney, Mr. Weber, who is very

24  experienced and enjoys a very good reputation with this Court

25  as being a good lawyer, has indicated to the Court that you do

1    not intend, or your team does not intend to offer any evidence

2    or testimony in the case, and they also indicated that you do

3    not intend to testify yourself.  You have a constitutional

4    right to remain silent, you don't have to testify at all.  And

5    I will instruct the jury that they cannot consider your

6    election to remain silent as an indication of guilt or

7    innocence.  But on the other hand, you have the right to

8    testify, that is you have the right to take the stand, raise

9    your right hand, just like all these other witnesses have, and

10   testify in this matter and tell your side of the story.  It is

11   clear that Mr. Weber and Ms. Tynes have probably counseled you

12   not to do that, and you may or may not heed their counsel.  In

13   other words, the decision whether to testify or not to testify

14   is not left to your lawyers, it is left to you.  Do you

15   understand that, sir?

16            **DEFENDANT:**  Yes, sir.

17            **THE COURT:**  Is it your desire not to testify in this

18   case?

19            **DEFENDANT:**  I do not choose to testify, Your Honor.

20            **THE COURT:**  Very well.  Thank you, you may be seated.

21       Let's talk about logistics, if we could, Mr. Weber.  I

22   don't want to bring the jury in and out and in and out.  When

23   the jury comes back, I presume that at that point you will

24   simply rest, would that be accurate?

25            **MR. WEBER:**  Yes, Your Honor.

1          **THE COURT:**  And at that point, also, since it's

2    getting close to 5:00, it would be my intention to let them go

3    home and come back tomorrow at which time we would take up the

4    matter of jury instructions and closing arguments.  Would that

5    be acceptable to the defendant?

6          **MR. WEBER:**  Yes, Your Honor.

7          **THE COURT:**  Mr. Buckner, Ms. Rose, is that acceptable

8    to the government?

9          **MS. ROSE:**  Yes, Your Honor.

10         **THE COURT:**  Obviously I'm not going to ask the

11   government if you have any rebuttal witnesses because there's

12   nothing to rebut.  So at that particular time, or when the

13   defendant finally rests, can we simply move on from that point

14   to excuse the jury for the evening?

15         **MS. ROSE:**  Yes, sir.

16         **THE COURT:**  Is that your position as well, Mr. Weber?

17         **MR. WEBER:**  Yes, Your Honor.

18         **THE COURT:**  Good.  So let me walk myself through it.

19   We're going to bring the jury back, you're going to rest, we're

20   going to let the jury go home and let them come back to hear

21   closing arguments and instructions.

22        Now, I have got proposed instructions from both sides, and

23   I want to take those instructions up with you tomorrow morning

24   at 9:00, but I don't want the jury sitting around waiting for

25   us.  So my proposal is to ask the jury to return, let's say, at

1    10:30, which will give us from 9:00 to 10:30 to approve the

2    instructions and to make -- and to record any objections that

3    there may be to the Court's instructions to the jury.

4         Now, I do intend to let you go home with at least a draft

5    of those instructions and you can look over them this evening;

6    when we come back tomorrow morning at 9:00, at which time we'll

7    conduct an informal charge conference with regard to the

8    instructions.  Would that be acceptable to the government?

9              **MS. ROSE:**  Yes, Your Honor.

10             **THE COURT:**  Would that be acceptable, Mr. Weber, to

11   you?

12             **MR. WEBER:**  Yes, Your Honor.

13             **THE COURT:**  And you as well, Ms. Tynes, I don't mean

14   to leave you out of the equation?

15             **MS. TYNES:**  Yes, Your Honor.

16             **THE COURT:**  Sounds like we have a plan.  Please bring

17   in the jury.

18        **(JURY IN AT 4:37 P.M.)**

19             **THE COURT:**  What says the defendant?

20             **MR. WEBER:**  The defense rests, Your Honor.

21             **THE COURT:**  Very well.  Ladies and gentlemen of the

22   jury, both sides have finally rested, that means that you have

23   heard all the evidence that you may properly consider in

24   returning your verdict in this case.  I am going to allow you

25   to go ahead and go home a little bit early, not real early, but

1  a little bit early.  And I am also going to ask that you return

2  tomorrow morning at 10:30, that gives you a little extra time

3  to get that second cup of coffee, if you will, at which time

4  we'll proceed with the case.

5       Now, as the case continues, the temptation to do research

6  on your own, maybe talk about the case, maybe look up some

7  terms, that temptation grows, and I ask you to resist it as

8  best you can.  Please remember the instructions of the Court.

9  This case is not over.  You see, even though you may have heard

10  all the facts already, you have not heard the Court's

11  instruction on the law, and that is the law that you must apply

12  to these facts.

13       So I am going to ask that you return tomorrow morning at

14  10:30 a.m. at which time we'll take up the instructions of the

15  Court on the law and we will take up the closing arguments by

16  the lawyers.  Please remember my instructions regarding your

17  conduct outside of the courtroom.  Don't talk with anyone about

18  the case, don't permit anyone to talk with you about the case.

19  In the event that the case that reported in the media, which I

20  think is unlikely, but if it is, please don't read about it,

21  don't listen to any radio or television newscast concerning it.

22  Do not make any independent investigations or any independent

23  research on your own.  As I have told you before, you are to

24  try this case and to reach your verdict based on the evidence

25  that you hear in this courtroom alone.  Don't use any

 1    technological tools like the Internet or anything else in that

 2    regard.

 3        I will see you, then, tomorrow morning, the Court Security

 4    Officer will show you where, at 10:30 a.m. and we'll continue

 5    the case.  Thank you and be careful going home.

 6        **(JURY OUT AT 4:40 P.M.)**

 7            **THE COURT:**  All right.  Just as I was telling them

 8    not to use any technology, it occurs to me there's no reason

 9    for you all to sit around and wait.  Would it be all right if I

10    email you a draft of my proposed instructions?  I don't want

11    you to have to sit around waiting for me to print it out.

12    Would that be all right with the government?

13            **MS. ROSE:**  Yes, Your Honor.

14            **THE COURT:**  Mr. Weber, Ms. Tynes, would that be all

15    right with you?

16            **MR. WEBER:**  Ms. Tynes and I are used to paper, Judge,

17    but we can do email, that's fine.

18            **THE COURT:**  Well, I am not going to run you off, now.

19    If you would like to hang around and wait for me to actually

20    print out a copy, I am okay with that too, I just thought I'd

21    make it easier on the parties.  You tell me what you want to do

22    and I'll do it.

23            **MR. WEBER:**  We can get it by email, Judge.

24            **THE COURT:**  There you go.

25            **MR. WEBER:**  We're just old, I guess.

1    **THE COURT:**  I'm with you.  I'm going to print it out

2    for myself.  Well, then we'll reconvene tomorrow morning at

3    9:00 a.m. at which time we'll take up an informal charge

4    conference in chambers and we'll go over the instructions.

5    We'll also go over closing argument and the final procedures

6    that we'll undertake while during closing arguments.  The

7    defendant in the meantime is remanded back to the custody of

8    the United States Marshals, and the government will retain

9    custody of these firearms.  See you tomorrow morning at 9:00.

10                        (TRIAL RECESSED)

11                            – – –

1

2                        CERTIFICATE OF COURT REPORTER

3

4            I, Sherri L. Penny, RPR, FCRR, Official Court Reporter

5    for the United States District Court for the Southern District

6    of Mississippi, appointed pursuant to the provisions of Title

7    28, United States Code, Section 753, do hereby certify that the

8    foregoing is a correct transcript of the proceedings reported

9    by me using the stenotype reporting method in conjunction with

10   computer-aided transcription, and that same is a true and

11   correct transcript to the best of my ability and understanding.

12           I further certify that the transcript fees and format

13   comply with those prescribed by the Court and the Judicial

14   Conference of the United States.

15

16

17

                            *S/ Sherri L. Penny*
18                          OFFICIAL COURT REPORTER

19

20

21

22

23

24

25